# Richmond

SOUTHERN RAILWAY COMPANY v. COMMONWEALTH OF VIRGINIA.

January 21, 1952.

Record No. 3875.

Present, All the Justices.

The opinion states the case.

*Thomas B. Gay, H. M. Pasco, Earl E. Eisenhart, Jr.* and *Charles Clark,* for the appellant.

*J. Lindsay Almond, Jr., Attorney General, Henry T. Wickham, Assistant Attorney General* and *William C. Seibert*, for the appellee.

HUDGINS, C. J., delivered the opinion of the court.

The Southern Railway Company is a common carrier of freight and passengers in interstate and intrastate commerce. Its main line in Virginia extends from the District of Columbia via Charlottesville and Lynchburg to Danville, Virginia (a distance of approximately 233 miles). It operates over this line numerous freight and 16 passenger trains daily. It maintains a branch line from Richmond to Danville, Virginia (a distance of approximately 141 miles). Over this line it operates numerous freight and 4 passenger trains daily. The passenger schedules are as follows: Train No. 7 leaves Richmond at 3:15 p. m. and arrives in Danville at 7:30 p. m.; Train No. 14 leaves Danville at 1:00 p. m. and arrives in Richmond at 5:10 p. m.; Train No. 11 leaves Richmond at 10:15 p. m. and arrives in Danville at 2:15 a. m.; Train No. 12 leaves Danville at 4:00 a. m. and arrives in Richmond at 8:00 a. m. The last two trains are referred to in the testimony as the "night trains."

The Southern Railway Company (hereinafter designated "Appellant") filed a petition with the State Corporation Commission praying that it be authorized to discontinue permanently the operation of trains Nos. 11 and 12 between Richmond and Danville. Among the parties who appeared in opposition to discontinuance of this passenger service were representatives of Powhatan, Charlotte, Halifax, and Amelia counties; the cities of Richmond and Danville; towns of Clover, Scottsburg, Halifax, South Boston, Keysville and Drakes Branch; the villages of Randolph, Chula and Greenbay; the Richmond Chamber of Commerce, the Danville Chamber of Commerce, the Brotherhood of Railroad Trainmen, and a large number of citizens who use these transportation facilities.

The State Corporation Commission (hereinafter designated "Commission") entered an order denying Appellant authority to discontinue the operation of these passenger trains. From that order Appellant perfected this appeal.

Appellant, in its brief, states that "The basis of this appeal is that the Commission's order is so unreasonable and arbitrary and so completely unsupported by the evidence that the order re-

sults in the confiscation of appellant's property without due process of law * * *.''

The evidence relied upon to support this contention, in the main, consists of statistical exhibits introduced and explained by various employees of Appellant. These exhibits contain numerous schedules and tables showing in some detail the revenues received and the expenses incurred in Appellant's intrastate operations. It appears from this evidence that the loss of revenue from the operations of trains Nos. 11 and 12 has been steadily increasing in the past few years. Appellant claims that the revenues received for the year 1948 were $119,245.88; that the "actual" direct expense was $91,917.42, and the "apportioned" expense was $93,814.59, making a total of "actual" and "apportioned" expenses $185,732.01, a loss of $66,486.13; for the year 1949 the revenues received were $105,305.23, "actual" expense $95,443.55, and "apportioned" expense $92,084.85, a total expense of $187,528.40, a loss of $82,223.17; and for the first six months of 1950 the revenues received were $46,124.80, "actual" expense $43,773.01, and "apportioned" expense $34,508.35, a total expense of $78,281.36, a loss of $32,156.47.

These calculations establish a ratio of expense "actual" and "apportioned" to total revenue for the year 1948, of $1.56 expended to earned revenue of $1.00; for 1949 $1.78 expended to earned revenue of $1.00, and for the 6 months period of 1950 $1.70 expended to earned revenue of $1.00.

The Commission questioned the accuracy of this "apportioned" expense and the propriety of charging the items stated therein to the operation of trains Nos. 11 and 12. Dealing with this phase of the subject the Commission, in its opinion, said: "Many of the 'apportioned' expenses are assigned to the number of pieces of equipment of a class, and the discontinuance of the use of one or two units of such equipment would have little effect, if any, in the total figures, except that it would give a fewer number of units upon which to divide the total costs. As an example, the item of passenger train car repairs in Exhibt 6, on page 3, is shown as $12,002 for six months. This is a cost of $2,000 a month for car repairs for the few cars used on trains Nos. 11 and 12. For the thirty months' period shown in Exhibit 6, the expense for repairs for passenger train cars is the astounding sum of $61,835.62. Obviously no such sum is being spent on this equipment. A glance at the picture of the equip-

ment used would certainly show that if it were spent it was largely wasted, because the cars show little, if any, improvement.

"Another figure set out for the first six months of 1950 is $9,092.32, representing passenger locomotive repairs on five new diesel engines. It appears that this is simply a figure based on 20-1/2¢ per mile and is the figure used on the railroad as a whole for all diesel engines and is an arbitrary figure as applied to the engines on this run.

"Other 'apportioned' expenses suffer from the same ills. There are the figures which the Southern Railway Company simply takes from all of its operations and apportions to this secondary line. It is not shown that any of the labor expenses can be eliminated and it is entirely likely that many of the expenses shown as 'apportioned' in Exhibit 6 would appear in accounts against other units even if trains Nos. 11 and 12 were discontinued."

Prior to July, 1949, 17 steam engines were used in the operation of the four passenger trains on the branch line from Richmond to Danville. Thereafter the steam engines were replaced by 5 new diesel engines. It is conceded that this replacement substantially reduced the cost of operations. However, the evidence does not accurately reflect the amount of this reduction. Each of these night trains Nos. 11 and 12 consists of a diesel engine, express car, mail car, a combination passenger coach, one straight coach, and Pullman sleeper. The crew consists of an engineer, fireman, conductor, baggageman, express messenger and porter. The same porter serves both trains.

Appellant's evidence tends to show that the average number of daily passengers transported by trains Nos. 11 and 12 was 71 in 1948, 59 in 1949, and 47 for the first nine months of 1950. Other testimony tends to show that the average number of daily passengers during 1950 was 53, and statistics introduced by the Chamber of Commerce indicate that the average number of daily passengers transported in 1950 and 1951, equals, if not exceeds, the average number transported in 1949 (actual statistics were not available at time of trial). The express and mail cars on each of these trains are usually loaded to capacity. On October 25, 1950, train No. 11 transported 426 packages of mail and 352 pieces of express.

The Commission, commenting on the conflicting evidence, in its opinion, said: "The figures presented by the petitioner were

not prepared by the witness presenting the figures. They were prepared in an office checking reports from different sources. This witness could not properly state that the figures in Exhibit 6 are correct so far as the number of passengers and revenue from passengers carried on passenger trains Nos. 11 and 12 are concerned. He, himself, had no way to check these figures. Obviously many errors could develop between the time the first figures are prepared and the statement is made for presentation to the Commission.''

It is conceded that Appellant is making substantial profit on both its freight and passenger service on its intrastate operations, notwithstanding the loss in the operation of trains Nos. 11 and 12. From 1946 through 1949, the ratio of expense to revenue for passenger service in Virginia was $.83 expended to $1.00 revenue earned, and for its freight service in Virginia $.61 was expended to $1.00 revenue earned. Appellant's profit on its passenger service in Virginia is more than absorbed in its expenditure for passenger service throughout its entire system—, that is, Appellant's system, as a whole, expends $1.38 for every $1.00 of revenue earned.

Appellant also contends that public convenience and necessity do not now require the operation of trains Nos. 11 and 12, because the territory is adequately served by the Greyhound bus line and private automobiles.

There are 31 stations and flag stops between Richmond and Danville. The territory is agricultural and industrial. Several witnesses testified that eleven industrial plants have been located in the area during the last three years; that officers of another industrial company had expressed an intention to locate in this territory, but probably would not do so if trains Nos. 11 and 12 were discontinued. The Government is building a dam at Buggs Island, now officially known as the ''Kerr Dam,'' at a cost of approximately $80,000,000, for the purpose of producing electric power in the area affected. According to Government reports and the advocates of this project, many industrial plants will be attracted to the area because of the anticipated low cost of electric power.

U. S. Highway No. 360 does extend from Richmond to Danville, and, in some places, it is close to and parallels Appellant's line, but in a great many it is from 3 to 8 miles from its railroad. A local bus line extends a short distance out of Danville, and

another extends a short distance out of Richmond, but these local buses do not transport passengers from Richmond to Danville and return, nor do they furnish the service to the intermediate points now being served by these trains.

There are approximately 500,000 inhabitants in the area served by this branch line. Richmond, with a population of 230,000, is the largest tobacco manufacturing center in the world. It has numerous other manufacturing plants. Danville, with a population of 30,000, and South Boston, with a population of 6,000, are among the largest tobacco markets in the world. Numerous textile mills operate at these points. Industrial plants are located in Burkeville, Keysville, Drakes Branch, Clarksville, Chase City, and other points in the territory. Trains Nos. 11 and 12 are not merely local trains operating between Richmond and Danville; they serve as feeders to Appellant's main line and connect with through trains running through the cities of Alexandria and Danville, and many municipalities in western North Carolina, including Greensboro, Charlotte and Winston-Salem. They furnish the only direct Pullman service between Richmond, Danville and other large municipalities in the south. If the Pullman service is discontinued, there will be no other such service in this territory.

The Commission is charged (Const. sec. 156 (b)) with the duty of supervising, regulating and controlling all transportation and transmission companies doing business in this State in all matters relating to the performance of their public duties "and shall require them to establish and maintain all such public service facilities and convenience as may be reasonable and just * * *." On appeal the order of the Commission "shall be regarded as *prima facie* just, reasonable and correct." (Const. sec. 156 (f))

We said in *Atlantic Coast Line Ry. Co.* v. *Commonwealth*, 191 Va. 241, 246, 61 S. E. (2d) 5: "No formula has been devised by which to determine in all cases the exact meaning of the phrase 'facilities and convenience as may be reasonable and just,'" and we quoted, with approval, from *Atlantic Coast Line Ry. Co.* v. *Public Service Comm.*, 77 F. Supp. 675, 684, to the effect that the "controlling criteria as we see it are these, the character and population of the territory served, the public patronage, or lack of it, the facilities remaining, the expense of operation as compared with revenue from same, and the operations of the carrier as a whole."

Among the witnesses who testified as to the public con-veninece and necessity for continuing the operation of these trains was J. H. Daniel, of Charlotte Court House, who recently constructed a plant for the manufacture of rugs at Keysville, Virginia. He stated that he would not have built this plant had he known that there was a possibility of discontinuing passenger trains Nos. 11 and 12. He also said: ''I would like to make this observation, that since that time, three years ago, I can count ten new industries. There is one at Burkeville, the Pacific Mills, one at Drakes Branch, the Pacific Mills, one at Keysville, one at Chase City, Craddock Terry, one at Halifax, Colonial Mills, one at Clarksville, one at Clover, a small one, one at South Boston, and I happen to know that in those ten plants there are over two thousand men and women employed and those men and women have employment which otherwise they would not have and while the labor slack has not been (fully) taken up in Southside Vir-ginia, it has been to a great extent and I believe whatever success these plants have had, the railroads have contributed to that success, and I have every reason to believe that we are in for a further expansion and whatever we do to damage the service of the railroad, whether passenger or freight, it is going to impair the progress in that community and that is the kind of progress we need in that section.''

W. L. Hammersly, representing the Board of Supervisors of Charlotte county, testified that the nearest bus line was 8 miles from Randolph, and ''Our people through that section have located in their present places of business and farms and mer-cantile establishments and factories with the idea that they would be served by these trains, all of the trains on the Southern Rail-way, feeling that this was a public service that they would be sure to keep. They feel, and we feel, that the loss of these trains will be a loss of public service that will cause a depreciation in the valuations of their property and business, and therefore a de-preciation in the income and revenue with which we run our County Government, and for these reasons we oppose the re-moval of these trains.''

Frank I. McDonough, Manager of the Transportation Bureau of the Richmond Chamber of Commerce, filed a memorandum, in which it is stated: ''The removal of the Richmond-Charlotte Sleeping car service will occasion considerable inconvenience to its patrons. This service is used to a considerable extent by

patrons engaged in sales, marketing and distribution. It is the only available rail service from Richmond to the important cities of Western North Carolina. The so called indirect interchange passenger service afforded by the Seaboard Air Line Railroad Company from Richmond via Hamlet, N. C. is not worthy of consideration as a substitute.

"The elimination of the Charlotte sleeping car service will unquestionably result in considerable loss of freight and express revenues to the Southern Railway and Railway Express Agency. A considerable portion of the Southern Railway local intermediate points express traffic is presently handled from Richmond on the day trains and in the event the night trains are discontinued much of the express traffic now handled on those trains would be rerouted. This could result in reducing the express shipments to the basic level of time freight service."

The principles of law are not too difficult or complex. The difficulty arises in applying the pertinent principles of law to the facts in each particular case. Where the evidence is in conflict, or where two or more reasonable inferences can be drawn therefrom, it is the duty of the court, under the Constitution and statute laws of this Commonwealth, to affirm the order of the Commission. We said in *Southern Ry. Co.* v. *Commonwealth,* 124 Va. 36, 53, 97 S. E. 343: "* * * this court will not presume that the State Corporation Commission will act from prejudice, or render an unjust or unfair decision against the railroad companies, but, on the contrary, will follow the mandate of the Constitution, 'that the action of the commission appealed from shall be regarded as *prima facie* just, reasonable and correct.'"

Mr. Justice Frankfurter, in *Alabama Public Service Comm.* v. *Southern R. Co.,* 341 U. S. 341, 71 S. Ct. 762, 95 L. ed. 1002, said: "Unlike a department store or a grocery, a railroad cannot of its own free will discontinue a particular service to the public because an item of its business has become unprofitable." He quoted, with approval, the following excerpt from *Chesapeake, etc., Ry. Co.* v. *Public Service Comm.,* 242 U. S. 603, 607, 37 S. Ct. 234, 61 L. ed. 520, 522: "One of the duties of a railroad company doing business as a common carrier is that of providing reasonably adequate facilities for serving the public. This duty arises out of the acceptance and enjoyment of the powers and privileges granted by the State and endures so long as they are retained. It represents a part of what the company undertakes

to do in return for them, and its performance cannot be avoided merely because it will be attended by some pecuniary loss.''

The record in *Alabama Public Service Comm.* v. *Southern R. Co., supra,* reveals that the railway company petitioned the Alabama Public Service Commission for authority to discontinue the operation of trains designated as Nos. 7 and 8, operated daily between Tuscumbia, Alabama, and Chattanooga, Tennessee, a distance of approximately 145 miles, mainly within Alabama. It was alleged that ''the public use of the service had so declined that revenues fell far short of meeting direct operating expenses.'' The Public Service Commission denied the prayer of the petition on the ground that there was a public need for the service. The railway company thereupon brought an action in the Federal District Court to enjoin the members of the Alabama Public Service Commission and the Attorney General from enforcing the order prohibiting discontinuance of these two trains. The three-judge Federal court, on the evidence introduced before it, granted the railway company's prayer and enjoined the public officials of Alabama from enforcing the order, thereby permitting discontinuance of the operation of the two trains. On appeal to the Supreme Court of the United States the order of the three-judge court was reversed, on the ground that the railway company had not exhausted its remedy in the State courts.

Mr. Justice Frankfurter wrote a concurring opinion, in which Mr. Justice Jackson joined, declaring, in effect, that the case should be dismissed on its merits. He said: ''It appears that the operation of Trains 7 and 8 resulted in a loss of $8,527.24 per month during the twelve-month period ending February 28, 1949. During the five-month period ending July 31, 1949, the loss amounted to $10,738.51 per month. But the railroad made no claim that it is operating at a loss, or failing to receive a fair return, either on its total investment or upon its investment within the State of Alabama * * *. This litigation seems to have been concerned almost exclusively with the operations of Trains 7 and 8. No showing whatever was made that by the loss incurred in running these trains Southern was deprived of that protection for its investment in Alabama which alone can be made the basis of a claim under the Due Process Clause of the Fourteenth Amendment.''

The order of the Commission is affirmed.

*Affirmed.*