536 P.2d 245

**ARIZONA CORPORATION COMMISSION and Russell Williams, Charles H. Garland and Al Faron, as members of and constituting said Commission, Appellants,**

v.

**PALM SPRINGS UTILITY CO., INC., a corporation, Appellee.**

**No. I CA–CIV 2292.**

Court of Appeals of Arizona, Division 1, Department B.

May 20, 1975.

Rehearing Denied June 19, 1975.
Review Denied July 10, 1975.

**125**

Bruce E. Babbitt, Atty. Gen., by Charles S. Pierson, Asst. Atty. Gen., Phoenix, for appellants.

Lewis & Roca by John P. Frank, Walter Cheifetz, Phoenix, and William C. Lewis, Jr., Madison, Wis., for appellee.

## OPINION

HAIRE, Chief Judge, Division 1.

On this appeal we are required to determine whether, in the absence of a previously adopted rule or regulation of general application, the Arizona Corporation Commission may validly issue an order requiring the appellee Palm Springs Utility Co., Inc. to furnish water of a specified quality to its customers. The pertinent facts are as follows.

Palm Springs is a water company certificated to provide water for public purposes in the Apache Junction area, and is subject to the regulatory jurisdiction of the Commission over public service corporations.

Prior to August 17, 1971 the Commission had received several complaints from some customers of Palm Springs concerning the taste and hardness of the water being served to them. On August 17, 1971 the Commission issued its order to show cause directing Palm Springs to appear and show cause why it should not either find a new source of water meeting federal recommended limits for total dissolved solids and chlorides, or, alternatively, why it should not put in machinery and equipment to bring its existing water supply within these recommended limits.

A hearing on these issues was held before the Commission on September 15, 1971. The Commission's witness, a State Health Department engineer, testified that the department tests conducted on samples of the Palm Springs water supply showed a content of 2,049 parts per million of total dissolved solids (as compared to a federal recommended limit of 500 parts per million), and 840 parts per million of chlorides (as compared to a federal recommended limit of 250 parts per million).[1] He testified that the water was safe to drink, that it met all mandatory requirements set by the State Health Department, but that it was neither palatable nor aesthetically pleasing. He also testified concerning the corrosive effect of the water on plumbing. There was also testimony indicating that many consumers obtained water from other sources for drinking, that the water was too hard for washing, that coolers became encrusted with deposits very quickly and that pipes constantly leaked, causing water loss and extra expense.

The State Health Department engineer recommended that a new source of water be found. He stated that a neighboring water company had found good water one to two miles away. Alternatively, he recommended desalinization or filtration, and told the Commission that such desalinization was being done for 67¢ per 1000 gallons, excluding the cost of pumping to deliver the water to the plant, in Buckeye, Arizona, a city southwest of Phoenix, Arizona.

Palm Springs' owner testified that it would cost approximately $87,000 to drill and outfit a new well.

After the hearing the Commission issued its opinion and order, Decision No. 41664, containing the following:

"THEREFORE, IT IS ORDERED that Palm Springs Utility Co., Inc. shall, not later than March 1, 1972, provide water to its consumers which meets the following:

"1. Total dissolved solids which shall not exceed 1,000 mg/1 (ppm);

"2. Chlorides not to exceed 250 mg/1 (ppm);

"3. Other minimum state requirements for the quality of drinking water as set forth in the rules and regulations of the Arizona State Department of Health other than those set forth above.

"IT IS FURTHER ORDERED that Palm Springs Utility, Co., Inc. shall seek the most economical means of supplying satisfactory water either by developing new wells, purchasing water of acceptable quality from other sources, or installing the necessary water treatment facilities to provide acceptable water, or any other means to provide water to meet the requirements as set forth above."

After the Commission denied its application for rehearing, Palm Springs filed a timely action in the Maricopa County Superior Court, pursuant to A.R.S. § 40–254, seeking review of the Commission's opinion and order. The trial court entered judgment setting aside the Commission's order.

From the trial judge's memorandum opinion and order, it is clear that the judgment was based solely upon the legal premise that in the absence of the prior adoption by regulation of standards of water quality generally applicable throughout the state, the Commission could not, by order entered after hearing, impose any such water quality standards upon a specific water company such as Palm Springs.

Neither party contends on this appeal that the Commission does not have the power to control the quality of water furnished to customers by public service cor-

---

1. See Public Health Service Drinking Water Standards, 1962, Regulation No. 521 (Exhibit 3).

porations. Indeed such a contention could not feasibly be made in view of the pertinent Arizona constitutional and statutory provisions.

Thus, Art. 15, § 3 of the Arizona Constitution, A.R.S., vests in the Corporation Commission broad regulatory powers over public service corporations in the following language:

> "The Corporation Commission shall have full power to, and shall, prescribe just and reasonable classifications to be used and just and reasonable rates and charges to be made and collected, by public service corporations within the State for service rendered therein, and make reasonable rules, regulations, and orders, by which such corporations shall be governed in the transaction of business within the State, and may prescribe the forms of contracts and the systems of keeping accounts to be used by such corporations in transacting such business, and make and enforce reasonable rules, regulations, and orders for the convenience, comfort, and safety, and the preservation of the health, of the employees and patrons of such corporations; . . .."

Turning to the statutes we find A.R.S. § 40-202A:

> "A. The commission may supervise and regulate every public service corporation in the state and do all things, whether specifically designated in this title or in addition thereto, necessary and convenient in the exercise of such power and jurisdiction."

Further direction is found in A.R.S. § 40-321A:

> "A. When the commission finds that the equipment, appliances, facilities or service of any public service corporation, or the methods of manufacture, distribution, transmission, storage or supply employed by it are unjust, unreasonable, unsafe, improper, inadequate or insufficient, the commission shall determine what is just, reasonable, safe, proper, adequate or sufficient, and shall enforce its determination by order or regulation."

A.R.S. § 40-361B requires:

> "B. Every public service corporation shall furnish and maintain such service, equipment and facilities as will promote the safety, health, comfort and convenience of its patrons, employees and the public, and as will be in all respects adequate, efficient and reasonable."

It will be noted that both A.R.S. §§ 40-321A and 40-361B provide general statutory standards against which the Commission's actions, whether by general regulation or by special order, may be reviewed. The real question is, how may this power be exercised? Again, the previously cited constitutional and statutory provisions are relevant.

The initial provisions of Art. 15, § 3, quoted above, states:

> "The Corporation Commission shall have full power to, and shall, prescribe just and reasonable classifications to be used and just and reasonable rates and charges to be made and collected, by public service corporations within the State for service rendered therein, . . .."

An argument could be made that the above-quoted constitutional provision requiring the Commission "to prescribe just and reasonable classifications" applies to the problem here involved, irrespective of any statutory provisions, and mandates the promulgation of rules and regulations prior to any enforcement activity by the Commission. However, there are at least two reasons why this argument must fail. First, the Arizona Supreme Court has held that the above-quoted provision of Art. 15, § 3 applies only to the rate-making activities of the Commission, thereby leaving the legislature free, in the exercise of the police power, to legislate in other areas, delegating such powers to the Commission ". . . upon such terms and limitations as it thinks proper". Corporation Commission v. Pacific Greyhound Lines, 54 Ariz. 159, 94 P.2d 443 (1939). The second reason

why the argument must fail is found in the subsequent provisions of Art. 15, § 3 itself, which indicate a contemplation by the drafters of the Constitution that the Commission might exercise its regulatory powers through orders as well as through rules and regulations of general applicability. Thus, we find language that the Commission shall "make reasonable *rules, regulations and orders,* by which such corporations shall be governed in the transaction of business within the State . . . [and] may . . . make and enforce reasonable *rules, regulations and orders* for the convenience, comfort, and safety in the preservation of the health of the employees and patrons of such corporations." (Emphasis added).

We find the same scheme carried forward in A.R.S. §§ 40–202B and 40–321A, previously discussed in this opinion. The pertinent language in § 40–202B is as follows:

"B. A public service corporation shall comply with every *order, decision, rule or regulation* made by the commission in any matter relating to or affecting its business as a public service corporation, and shall do everything necessary to secure compliance with and observance of every such order, decision, rule or regulation. (Emphasis added).

And, in A.R.S. § 40–321A:

"When the commission finds that . . . the facilities or service of any public service corporation . . . are . . . unreasonable, . . . inadequate . . . the commission shall determine what is . . . reasonable . . . [or] . . . adequate . . . and shall enforce its determination *by order or regulation.*" (Emphasis added).

Two pertinent generalizations may be drawn from the constitutional and statutory provisions which we have thus far discussed in this opinion. First, the regulatory powers of the Commission are not limited to making orders respecting the health and safety, but also include the power to make orders respecting comfort, convenience, adequacy and reasonableness of service, which is what was done by the Commission in the decision hereunder consideration. Second, both in the Constitution and the statutes, the lawmakers recognized that in regulating public service corporations the Commission might accomplish some goals by the use of rules and regulations of general applicability, but would have to accomplish others by the use of orders pertaining to particular situations or to particular public service corporations.

The accomplishment of regulatory goals by public utility commissions through the use of specialized orders as well as by rules and regulations of general applicability is not peculiar to Arizona law, but rather, is a generally recognized concept. For examples of situations where courts in other jurisdictions have recognized the discretionary power in public utility commissions to enter individualized orders, *see* Northwestern Telephone Service Co. v. Public Utilities Commission, 175 Ohio St. 300, 194 N.E.2d 434 (1963) ; Chicago, M., St. P. & Pac. R. Co. v. Public Service Commission, 221 Ind. 1, 46 N.E.2d 230 (1943) ; Southern Railway Co. v. Commonwealth, 193 Va. 291, 68 S.E.2d 552 (1952). Also, the various decisions entered by public utility commissions show that it is not uncommon for commissions to make specific orders to particular water companies regarding the quality of water being served by them. *See* Johnstone v. Rensselaer Water Company, 20 P.U.R. (n.s.) 417 (New York Department of Public Service, State Division, Public Service Commission (1937) ) ; Town of Bearcreek v. Bearcreek Water Company, 6 P.U.R. (n.s.) 380 (Montana Public Service Commission (1934)) ; Re Conejo Valley Water Company, 58 P.U.R.3d 284 (Cal. Public Utilities Commission (1965)).

Unquestionably, as a general principle of administrative law, the promulgation of rules and regulations of general applicability is to be favored over the generation of policy in a piecemeal fashion through individual adjudicatory orders. See authorities cited, 59 Cornell Law Re-

view 375, "The Courts and the Rulemaking Process: The Limits of Judicial Review".

The rationale of this concept is well set forth in the leading case of Securities and Exchange Commission v. Chenery Corporation, 332 U.S. 194, 67 S.Ct. 1575, 91 L. Ed. 1995 (1947) as follows:

"Since the Commission, unlike a court, does have the ability to make new law prospectively through the exercise of its rule-making powers, it has less reason to rely upon ad hoc adjudication to formulate new standards of conduct within the framework of the Holding Company Act. The function of filling in the interstices of the Act should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied in the future. But any rigid requirement to that effect would make the administrative process inflexible and incapable of dealing with many of the specialized problems which arise. [Citation omitted]. Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule. Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations. In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule, or by individual order. To insist upon one form of action to the exclusion of the other is to exalt form over necessity.

"In other words, problems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule. Or the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule. Or the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule. In those situations, the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective. There is thus a very definite place for the case-by-case evolution of statutory standards. And the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency. See Columbia Broadcasting System v. United States, 316 U.S. 407, 421, 62 S.Ct. 1194, 1202, 86 L.Ed. 1563." 67 S.Ct. at 1580.

While we have cited and discussed relevant constitutional and statutory provisions which in our opinion give the Commission the authority to enter the order here entered, Palm Springs places great reliance upon the provisions of A.R.S. § 40–321B.[2] We do not give that statute the all-encompassing meaning suggested by Palm Springs. In our opinion, while it is clear that A.R.S. § 40–321B mandates the adoption of regulations governing the conditions under which customers in general are entitled to receive certain services or commodities from a public service corporation, it does not expressly or impliedly prohibit the Commission from dealing with specialized situations on a case by case approach, so long as there exists a rational statutory or constitutional basis for the action, and the action is not so discriminatory as to constitute a denial of the equal protection clause. Any other interpretation would require that we ignore the previously discussed constitutional and statutory provisions, thereby imparting an unintended rigidity to the administrative process, rendering it inflexible and incapable of dealing with

---

2. A.R.S. § 40–321B reads as follows:
"B. The commission *shall prescribe regulations* for the performance of any service or the furnishing of any commodity and upon proper demand and tender of rates, the public service corporation shall furnish the commodity or render the service within the time and upon the conditions prescribed." (Emphasis added).

many of the complex and specialized problems which arise within the area of its constitutionally and statutorily invested competence.[3]

. ▮ In our opinion, the facts as shown in the record before the Commission and the trial court fully support the order herein entered. Therefore, the trial court's order setting aside the Commission's decision must be reversed. In arriving at this conclusion we have not considered Palm Springs' contention that the Commission's decision was defective in that it did not set forth findings of fact and conclusions of law. This contention was not raised before the Commission in Palm Springs' application for rehearing. Under the provisions of A.R.S. § 40–253C, Palm Springs is prohibited from urging in any court any ground not set forth in the application for rehearing. Since the question is not properly before us, we do not reach the issue of whether Arizona law requires that findings of fact and conclusions of law be set forth in a Commission decision of the nature here involved.

▮ Palm Springs further complains of the Commission's order because no provision was made therein for a rate increase. Suffice it to say that when and if Palm Springs complies with the Commission's decision, Palm Springs' expenditures made in compliance with the Commission's decision would necessarily be a factor which the Commission must consider in any subsequent rate proceedings.

The judgment is reversed and the matter is remanded with directions to enter judgment affirming the Commission's decision.

EUBANK, J., concurs.

JACOBSON, Presiding Judge (dissenting):

My dissent with the results reached by a majority of the court in this case is a narrow one.

I agree, that under the constitution and applicable statutes, the Arizona Corporation Commission has the power to enter specialized orders affecting the quality of the service provided by a public utility without the necessity of adopting a general industry-wide regulation covering the subject. However, in my opinion the use of the specialized order power to affect quality of service can and should be utilized only in those situations where the facts indicate that the problem sought to be resolved by the specialized order is not capable of being dealt with by an industry-wide regulation, either because of lack of experience by the Commission to warrant a hard and fast rule, or because the problem itself is local or specialized in nature. *See* Securities and Exchange Commission v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), quoted at length in the majority opinion. It is further my opinion that because the formulation of rules and regulations of industry-wide application is favored over the formulation of such rules by the use of piecemeal specialized orders, the burden of proof that the use of specialized orders rather than adoption of general application rules is justified rests on the Commission.

With these principles in mind (and I do not believe the majority disagrees with these principles), I believe as a general proposition that the amount of dissolved solids or chlorides in public water is a

---

3. In its memorandum opinion the trial court relied upon the provisions of A.R.S. § 40–322A subsections 1 and 2 as requiring the reversal of the Commission's order. Palm Springs did not contend in the trial court, and has not urged on this appeal, the applicability of that statute. Arguably that statute, insofar as applicable to water utili-

ties, applies only to standards relating to *measurement* of the services rendered. In any event, since it is expressed in the permissive "may", it cannot be construed to *require* the adoption of general rules and regulations concerning the matters with which it deals.

problem of general concern in the south-west and especially in Arizona, and is capable of being dealt with by an industry-wide regulation. California, for example, has had no difficulty in applying an industry-wide regulation controlling this subject. West's Ann.Cal.Health & Safety Code § 4027 (1970) and § 4028 (Supp.1975). Being a subject which can be regulated adequately by a general application rule, I see no justification for singling out the Palm Springs Utility Co. for a specialized order dealing with the particular quality of its water.

Assuming that the subject of water quality is not capable of being controlled by a regulation or rule of general application (there was no evidence present in this case, one way or the other, and in my opinion results in a failure of proof on the Commission's part), I fail to find any facts in this case which would justify the use by the Commission of its specialized order power. While there was evidence that the water quality at Apache Junction was poor there was no evidence that the problem of poor water quality was peculiar to Apache Junction. Likewise, there was no evidence presented that the localized problems of water quality present at Apache Junction required specialized treatment as compared to the treatment afforded other water users in the state. The evidence was completely lacking in regard to the Commission's lack of experience in handling hard water problems so as to justify the "trial run" specialized order entered in the Palm Springs case. Finally, I do not believe the problem of hard water in the state of Arizona where drawing from underground wells through caliche is the rule rather than the exception, is so unforeseeable as to lay the foundation for the type of specialized order entered in this case.

In my opinion the utilization of the specialized order power of the Commission should be restricted to those situations which truly justify its use. To allow its unsubstantiated use, which in my opinion occurs in this case, is to run afoul of the equal protection clauses of both the state and federal constitutions.

I would therefore affirm the trial court, not on the basis that the power to enter specialized orders does not exist, but on the basis that the Commission failed to show that the use of the power was justified in this case.