*938 P.2d 481*

**GENERAL MOTORS CORPORATION, a Delaware corporation, Plaintiff–Appellant,**

v.

**ARIZONA DEPARTMENT OF REVENUE, an agency of the State of Arizona, Defendant–Appellee.**

No. 1 CA–TX 95–0015.

Court of Appeals of Arizona, Division 1, Department T.

Nov. 26, 1996.

Reconsideration Denied Jan. 24, 1997.

Review Denied July 1, 1997.

Quarles & Brady by Michael G. Galloway Jeffrey A. Sandquist, Phoenix, for Plaintiff–Appellant

Grant Woods, Attorney General by Gail H. Boyd, Kimberly J. Cygan, Special Assistant

Attorney General, Phoenix, for Defendant–Appellee.

TOCI, Judge.

General Motors Corporation ("GM"), a Delaware corporation headquartered in Detroit, Michigan, engages in automobile manufacturing. The Arizona Department of Revenue ("DOR") audited GM primarily concerning sales of automobiles to GM dealerships and assessed additional Arizona income taxes for the tax years 1976 through 1983. GM challenged DOR's assessment before DOR and the State Board of Tax Appeals, Division Two. Ultimately unsuccessful, it brought this action in the Arizona Tax Court in February 1994. On cross-motions for summary judgment, the tax court ruled for DOR without stating its reasons, and GM now appeals.

We have appellate jurisdiction pursuant to Ariz.Rev.Stat. Ann. ("A.R.S.") section 12–2101(B). We find no errors by the tax court and therefore affirm on all issues.

## I. ISSUES PRESENTED

GM contends that DOR wrongly:

(1) disallowed GM's deductions for contributions to its Employee Stock Ownership Plan from 1979 through 1983;

(2) used 100 percent of GM's Arizona destination sales in the formula for apportioning a share of GM's total income to Arizona for the years 1978 through 1983;

(3) disallowed GM's deductions in tax years 1976 through 1978 for sums it paid to General Motors Export Corporation, a GM subsidiary operated as a domestic international sales corporation pursuant to 26 U.S.C. §§ 991–997; and

(4) apportioned and taxed as Arizona-source income a share of GM's patent royalties during tax years 1976 through 1983.

Given the rather lengthy factual and legal history related to the individual issues, we will summarize the background of each and address its merits in turn.

## II. STANDARD OF REVIEW

■ In reviewing the grant of summary judgment, we take the facts in the light most favorable to GM, the non-moving party, and we determine *de novo* whether the trial court properly applied the law. *Gonzalez v. Satrustegui*, 178 Ariz. 92, 97, 870 P.2d 1188, 1193 (App.1993).

## III. EMPLOYEE STOCK OWNERSHIP PLAN CONTRIBUTIONS

From 1979 through 1983, GM maintained and contributed to an Employee Stock Ownership Plan ("ESOP"). Under the United States Internal Revenue Code ("I.R.C."), GM could elect each tax year either to take a *credit* for its ESOP contributions against its federal income tax liability or a *deduction* in that amount from its federal gross income.[1] In each of the tax years 1979 through 1983, GM elected the former.

In 1978, our legislature adopted a new income tax code, the Arizona Income Tax Act of 1978,[2] which for the first time directly adopted each corporate taxpayer's "federal taxable income for the taxable year" as the corporation's "Arizona gross income." A.R.S. § 43–1101(1) (Supp.1996).[3] The statutes specify the adjustments to a taxpayer's

---

1. Statements about federal income tax law in this opinion are from undisputed portions of the parties' statements of facts below and are not intended as precise descriptions of federal law.

2. *See* 1978 Ariz. Sess. Laws Ch. 213, § 2.

3. The "Declaration of intent" provision, A.R.S. § 43–102, provides in pertinent part:
2. To adopt the provisions of the Federal Internal Revenue Code relating to the measurement of taxable income for corporations, ..., to the end that taxable income reported each taxable year by a corporation, ... shall be the identical sum reported to this state, subject only to modifications contained in this title.
3. To ... appl[y] ... the various provisions of the Federal Internal Revenue Code relating to the definitions of income, exceptions, deductions, ..., accounting methods, taxation of individuals, corporations, ..., basis and other pertinent provisions relating to gross income as defined, resulting in an amount called adjusted gross income for individuals and taxable income for corporations, ... in the internal revenue code.

Arizona gross income that yield its "taxable income" or "net income." A.R.S. §§ 43–1121 through 43–1130.01 (Supp.1996); A.R.S. § 43–1101(2),(6) (Supp.1996).

By operation of A.R.S. section 43–1101(1), GM's Arizona gross income figure for each tax year in issue consequently reflected no reduction for GM's yearly ESOP contributions. Although no Arizona statute allowed either a credit or a deduction for ESOP contributions against a taxpayer's state income tax liability,[4] GM deducted those contributions in calculating its Arizona taxable income.[5]

GM argues that Arizona law must permit a deduction for ESOP contributions because it does not allow a credit for such contributions. Further, GM argues that when DOR disallowed those deductions, DOR directly taxed its ESOP contributions in violation of the federal preemption doctrine. It also contends that denial of the ESOP deduction violated its right to equal protection of the law by treating disparately a corporate taxpayer that claimed a federal tax credit from one that did not. We first consider whether Arizona law authorized a deduction for ESOP contributions.

## A. Deductibility of GM's ESOP Contributions

■ GM argues that Arizona's adoption of the I.R.C. provisions was intended only to adopt those provisions logically consistent with Arizona's tax scheme but not to adopt any that were logically inconsistent. Because Arizona law lacks a tax *credit* for ESOP contributions, reasons GM, the federal provision that denies the ESOP *deduction* to a taxpayer that accepted the alternative federal tax credit never became operative in Arizona, and DOR could not deny it a legitimate business expense deduction.

GM's argument hinges on the unarticulated premise that after passage of the new tax act, Arizona still allowed an "ordinary and necessary business expenses" deduction from

Arizona gross income and that DOR improperly applied the federal provision denying a deduction for ESOP contributions to taxpayers who had opted for a federal tax credit. *Cf.* Former A.R.S. §§ 43–123.03, 43–123.18. GM's premise, however, lacks any statutory support. Under the 1978 Tax Act, Arizona adopted all I.R.C. provisions "resulting in an amount called ... taxable income for corporations," including the provision that authorizes the federal business expenses deduction. A.R.S. § 43–102(A)(2), (3); A.R.S. § 43–1101(1). Because that deduction, among others, would be factored into a taxpayer's federal taxable income (adopted as Arizona gross income), the 1978 Act logically eliminated Arizona's former business expense and other deduction provisions as unneeded and duplicative. *See* 1978 Ariz. Sess. Laws Ch. 213, § 1.

No post–1978 law authorizes a deduction from Arizona gross income for a corporate taxpayer's ESOP contributions. Those contributions will be absent from a taxpayer's Arizona taxable income only to the extent that the taxpayer previously deducted them from federal gross income in arriving at federal taxable income (Arizona gross income). Because GM could not both deduct the expenses and receive a tax credit for federal tax purposes, DOR properly disallowed GM's deductions from Arizona gross income for ESOP contributions. *See Arizona Dep't of Revenue v. Transamerica Title Ins. Co.,* 124 Ariz. 417, 420, 604 P.2d 1128, 1131 (1979) (right to tax deduction is purely statutory).

GM cites numerous cases from other jurisdictions whose tax schemes differ substantially from ours. For example, in *George, Inc. v. Norberg,* 444 A.2d 868 (R.I.1982), *cert. denied sub nom. Norberg v. George, Inc.,* 459 U.S. 908, 103 S.Ct. 214, 74 L.Ed.2d 170 (1982), the state tax provision expressly authorized a taxpayer to reduce its gross income by items deductible under federal income tax law. Arizona has no such provision, and thus *Norberg* is inapposite. GM's

4. *See* A.R.S. §§ 43–1161 through 43–1174 (Supp. 1996).

5. A.R.S. § 43–1101(2) provides: " 'Arizona taxable income' of a corporation means its Arizona

gross income adjusted by modifications specified in article 3 of this chapter [A.R.S. §§ 43–1121 through 43–1130.01]."

analogy to *Winterset, Inc. v. Commissioner of Taxes*, 144 Vt. 230, 475 A.2d 231 (1984), is no more persuasive. Although federal law required the taxpayer to reduce its wage/salary deductions in exchange for a job creation tax credit, Vermont's own income tax calculations were not tied to federal taxable income. The Vermont Supreme Court held that the employer need not reduce the wage/salary deduction on the state return. Similarly, in *Bogner v. State Department of Revenue and Taxation*, 107 Idaho 854, 693 P.2d 1056 (1984), Idaho allowed taxpayers to take any deductions defined by federal law whether or not they had actually claimed those deductions on their federal returns. These cases do not control here.

Arizona law did not authorize the ESOP deduction that DOR disallowed for taxable years 1979 through 1983, and the assessment is entirely proper.

## B. Preemption by ERISA

■ The parties agree that GM's ESOP is a qualified defined contribution plan governed by the federal Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 through 1461. ERISA contains an express preemption provision that states in part, "[T]he provisions of this subchapter and subchapter III of this chapter *shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan*" and not exempt under the statute. 29 U.S.C. § 1144(a) (emphasis added).

GM urges a very broad construction of this preemption provision. It contends that some courts have held that ERISA preempts state taxing statutes and that any state statute with the slightest effect on an employee benefit plan is void; that DOR's disallowance is a direct tax on GM's contributions to its qualified pension plan, which in turn deters contributions to such plans; and that the disallowance effectively controls its federal tax reporting, contrary to the intent of the preemption provision.

■ We cannot agree that the preemption provision reaches this far. The United States Supreme Court has acknowledged the

"expansive" nature of the ERISA preemption language. *See, e.g., FMC Corp. v. Holliday*, 498 U.S. 52, 58, 111 S.Ct. 403, 407–08, 112 L.Ed.2d 356, (1990); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45–46, 107 S.Ct. 1549, 1551–52, 95 L.Ed.2d 39 (1987). But, 29 U.S.C. § 1144(a) does not annul every state enactment that affects an employee benefit plan. As the Court indicated in *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 100 n. 21, 103 S.Ct. 2890, 2901 n. 21, 77 L.Ed.2d 490 (1983), "Some state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." *See Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988) (state garnishment of employee benefit welfare plan not preempted); *American Tel. and Tel. Co. v. Merry*, 592 F.2d 118, 121 (2d Cir.1979) (no preemption of state garnishment of spouse's pension income to enforce support order).

Most recently, the Supreme Court clarified the scope of the preemption provision. In *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.*, U.S. , 514 U.S. 645, 649, 115 S.Ct. 1671, 1673, 131 L.Ed.2d 695 (1995), a New York statute required hospitals to collect surcharges from patients covered by ERISA plans underwritten by commercial insurers but not from those covered by Blue Cross/ Blue Shield plans. The district and Second Circuit courts both held that the statute was preempted because it purposely increased the cost of insurance and health care and thereby interfered with the ERISA plans' choices in health care coverage. *Id.* at 654, 115 S.Ct. at 1676.

The Supreme Court disagreed. In *Shaw*, it had held that a law " 'relates to' an employee benefit plan, ... if it has a connection with or reference to such a plan." *Id.* at 656, 115 S.Ct. at 1677 (quoting *Shaw*, 463 U.S. at 96–97, 103 S.Ct. at 2900). The New York statute, however, made no "reference to" ERISA plans. In construing the preemption provision's words, "relates to," the Court looked to the objectives of the ERISA statute itself. *Id.* Through preemption, Congress intended to "avoid a multiplicity of

regulation in order to permit the nationally uniform administration of employee benefit plans." *Id.* at 657, 115 S.Ct. at 1677–78.

In contrast with prior cases in which the Court had found preemption, however, the New York statute did not mandate employee benefit structures or provide alternate mechanisms to enforce rights in ERISA plans. *Id.* at 658, 115 S.Ct. at 1678. By affecting the attractiveness of the various plans, the Court agreed that the surcharges have an indirect economic effect on insurance buyers' choices. *Id.* at 659, 115 S.Ct. at 1679. But that indirect effect "does not bind plan administrators to any particular choice and thus function as a regulation of an ERISA plan itself" nor "preclude uniform administrative practice or the provision of a uniform interstate benefit package.... It simply bears on the costs of benefits and the relative costs of competing insurance to provide them." *Id.*

The Court "acknowledge[d] that a state law might produce such acute, albeit indirect, economic effects, by intent or otherwise, as to force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers, and that such a state law might indeed be pre-empted under [ERISA] § 514 [29 U.S.C. § 1144]." *Id.* at 668, 115 S.Ct. at 1683. The Court concluded, however, that the indirect effect of these surcharges on the relative prices of insurance policies was not something Congress intended to eliminate. *Id.; accord Greenblatt v. Delta Plumbing & Heating Corp.,* 68 F.3d 561, 574 (2d Cir.1995). *See also Employee Staffing Servs., Inc. v. Aubry,* 20 F.3d 1038, 1041–42 (9th Cir.1994) (statute cannot tell employer how to write ERISA plan but can require employer to do something regardless of how plan is written); *Batiza v. Superfon,* 175 Ariz. 431, 436, 857 P.2d 1285, 1290 (App. 1992) (state laws, rules, and regulations cannot affect ERISA plan's internal administration).

■ GM essentially complains that Arizona's income tax system omits a provision allowing it to deduct ESOP contributions that it chose not to deduct on its federal return. Thus, no Arizona income tax provi-sion improperly "refers to" ERISA plans. GM contends, however, that a "relationship" or "connection" exists between the omission in Arizona's tax scheme and ERISA plans because the tax scheme lessens the economic appeal of contributing to ERISA plans and "dictates" the way GM structures its federal tax return. GM cites no authority that even suggests that this latter effect triggers preemption. To the contrary, state regulations with indirect economic effects on ERISA plans, but that do not limit the plans' coverage choices, are not preempted. Therefore, the ERISA preemption clause does not apply to Arizona's omission of a tax deduction.

## C. Deduction Disallowance as Equal Protection Violation

■ GM alleges that Arizona's failure to allow deductions for employer contributions to ERISA plans treats differently taxpayers who took a federal deduction from those who took a federal credit in violation of the federal and state constitutions. *See* U.S. Const. amend. XIV and Ariz. Const. art. II, § 13. GM contends that no rational basis for disparate treatment exists or, alternatively, that an "extremely important federal interest" is at stake, which subjects the tax scheme to strict scrutiny.

■ Equal protection prohibits discrimination between taxpayers in the same class. GM fails to demonstrate beyond a reasonable doubt, however, that the tax scheme's differing impact on the two groups of taxpayers has no basis in reason and that the two groups therefore form a single class. *See Chevron Chem. Co. v. Superior Court,* 131 Ariz. 431, 438, 641 P.2d 1275, 1282 (1982) (court must find, beyond a reasonable doubt, conflict of statute with constitution).

■ We normally subject economic legislation to the rational basis test. *Arizona Downs v. Arizona Horsemen's Found.,* 130 Ariz. 550, 555, 637 P.2d 1053, 1058 (1981). To satisfy this test, a statutory classification "must be rationally and reasonably related to furthering" a legitimate state interest. *Big D Constr. Corp. v. Court of Appeals,* 163 Ariz. 560, 566, 789 P.2d 1061, 1067 (1990). We will uphold a classification if we can

imagine any set of facts rationally justifying it. *State v. Kelly,* 111 Ariz. 181, 184, 526 P.2d 720, 723 (1974), *cert. denied sub nom. Kelly v. Arizona,* 420 U.S. 935, 95 S.Ct. 1143, 43 L.Ed.2d 411 (1975).

By adopting the 1978 Tax Act, the legislature attempted to simplify our tax scheme, and therefore incorporated all I.R.C. provisions that determine a corporate taxpayer's federal taxable income, including those governing federal tax deductions; adopted the taxpayer's federal taxable income as its Arizona gross income; and largely eliminated the analogous deductions formerly allowed under Arizona tax laws. The I.R.C. provision denying a deduction for ESOP contributions if the employer took a federal tax credit is one that affects the calculation of federal taxable income, and hence Arizona gross income. Because a federal tax credit will likely be more economically advantageous than a deduction in the same amount, a taxpayer who takes a credit may pay less in overall taxes than a competitor who takes a federal tax deduction. It is not arbitrary or irrational for Arizona to attempt to equalize the tax burden of the competitor with the taxpayer who took a federal tax credit. This is a rational basis for the Arizona tax scheme.

■ We find no merit to GM's alternative contention that Arizona's tax scheme affects an unspecified but "extremely important federal interest" and must pass strict scrutiny. GM points to no fundamental right or suspect class affected by the tax scheme. *See Big D Constr.,* 163 Ariz. at 566, 789 P.2d at 1067. We find no denial of equal protection.

## IV. 1966 AGREEMENT FOR APPORTIONING GM INCOME TO ARIZONA

■ The Arizona State Tax Commission, DOR's predecessor, audited GM for the tax years 1954 through 1963. At that time, Arizona Compilation of Administrative Rules and Regulations ("A.C.R.R.") 15–2–135–

8(b)(5) provided that the numerator of a multistate corporation's Arizona sales factor "includes sales resulting from employee sales activities of the taxpayer within Arizona" (solicitation sales). For the audit period, GM had reported few or no Arizona sales.

The Commission proposed an assessment of an additional $1.1 million in taxes and interest based in part on a sales factor that included 100 percent of GM's Arizona "destination sales," i.e. the sales of vehicles delivered or shipped to an Arizona purchaser whether or not induced by GM employees in Arizona. After a joint meeting to discuss the proposed assessment, someone from GM wrote a document that GM produced in connection with this recent audit. The undated, unsigned writing concludes, "[T]he Commission agreed to include only 50 percent of GM sales to Arizona customers in the apportionment factor." [6]

A tax analyst who previously was an auditor with DOR avowed what his supervisor and the director of the income tax division had told him about the 1966 meeting. He stated that GM claimed to have solicited few sales in Arizona, but, "[t]o settle the proposed assessment ..., GM and the Department agreed to use 50 percent of the sales of cars delivered or shipped to an Arizona purchaser in the numerator of the sales factor as a measure of the amount of sales resulting from the sales activities of GM employees in Arizona."

GM's tax counsel since approximately 1989 avowed that the 1966 agreement simply reflected GM's concession that its sales activities had a sufficient nexus with Arizona to permit a tax on GM's income. Counsel stated, however, that the agreement did not resolve whether 50 percent of Arizona destination sales was a valid estimate of Arizona solicitation sales but that the Commission agreed to GM's use of 50 percent of its destination sales in the numerator of the

6. The writing also stated that the Commission thought that all sales to Arizona customers should be considered in apportioning income to Arizona because GM exercised control over its Arizona dealers through sales policies, advertising, service procedures, product warranties, and the granting of franchises.

GM contended that its contacts with dealers "were directed primarily to assisting dealers in developing and maintaining good standards of sales and service to the public" and that GM had no offices or warehouses in Arizona.

sales factor in the future and that GM had subsequently filed its Arizona returns on that basis.

A company that earns multistate income is subject to Arizona income taxation on a proportionate share of that income. Former A.R.S. section 43–135(g) or section 43–1141 (1980), effective January 1, 1979, governed apportionment of multistate income for the relevant time period. Under either statute, Arizona's share of income was to be based upon "sales, purchases, expenses of manufacture, payroll, value and situs of tangible property ... or by reference to any of these or other factors ... as is fairly calculated to determine" the net income, former A.R.S. section 43–135(g), or the taxable income, former A.R.S. section 43–1141(B)(2), derived from or attributable to sources within Arizona.

DOR implemented the apportionment principle through a three-factor formula that amounted to the average of the ratio of (1) the taxpayer's Arizona property to its property everywhere, (2) its Arizona payroll to its payroll everywhere, and (3) its Arizona sales to its sales everywhere. Former A.C.R.R. R15–2–135–8; former Arizona Administrative Code ("A.A.C.") R15–2–1141.[7] The meaning of the term "Arizona sales," however, changed significantly in 1978. Under former A.C.R.R. R15–2–135–8(B)(5), Arizona sales encompassed only those sales generated through the activities of the taxpayer's Arizona employees, or so-called "solicitation sales."

Effective January 26, 1978, the amended rule provided that if a corporate taxpayer delivered or shipped tangible personal property to a purchaser in Arizona ("destination sales"), those sales were to be included in the Arizona sales factor. Former A.C.R.R. R15–2–135–8(B)(5)(b)(i). DOR applied the amended regulation in auditing GM's returns for tax years 1978 through 1983 and included 100 percent of GM's destination sales in calculating the sales factor for those years.

GM does not contend that this change exceeded DOR's administrative powers. The meaning of the 1966 settlement, however,

that the sales factor in the three-factor formula would be 50 percent of its Arizona destination sales, remains in dispute. GM asserts that the 50 percent agreement had nothing to do with approximating solicitation sales, that the 1966 agreement survived the 1978 rule change, and that the agreement continued to bind DOR through the 1979 through 1983 tax years.

DOR, on the other hand, asserts that the parties agreed that 50 percent of GM's destination sales would be substituted for Arizona solicitation sales in the formula but that when the definition of sales became "destination sales" in 1978, the 1966 agreement became inoperative. DOR thus argues that it was free to use 100 percent of Arizona destination sales in calculating GM's sales factor.

We assume in GM's favor that the State Tax Commission had authority to enter into the 1966 agreement, that competent evidence exists that both sides intended the settlement to apply to all future years, and that the 1978 rule change was legally insufficient to supersede the 1966 agreement. Thus, we address GM's contention that DOR is bound by the 1966 agreement and estopped to issue the additional assessment.

GM cites *Tucson Electric Power Co. v. Arizona Department of Revenue*, 174 Ariz. 507, 514, 516, 851 P.2d 132, 139, 141 (App. 1992), in which we held that DOR was estopped from denying a taxpayer an otherwise appropriate deduction because the taxpayer had followed DOR's erroneous instructions and omitted a prerequisite procedural step. GM argues that the 1966 resolution of "how to report GM's sales in its apportionment ratio" was a procedural, not legal, matter that estopped DOR from retroactively changing the calculation of the sales factor to its detriment.

We disagree. Choosing the components of the sales factor formula is not a procedural matter. Calculating the numerator of that formula requires more data than simply how to report sales. The sales factor is a precise ratio that, with other factors, determines the exact share of a multistate taxpayer's income

---

**7.** Amended A.C.R.R. R15–2–135–8 was renumbered as A.A.C. R15–2–1141 effective February 7, 1986, and was supplanted by the current income apportionment rules, A.A.C. R15–2–1141 *et seq.*

that will be subject to Arizona income tax. It is an integral part of the calculation in determining the tax itself.

Further, in *Tucson Electric*, we noted that through estoppel, the taxpayer sought to enforce, rather than to avoid, the statute's basic purpose. *Id.* at 515, 851 P.2d at 140. DOR's representations "were not that the taxpayer's activities were not taxable," but rather, related solely to a procedural matter. *Id.*

GM also cites the tax court's opinion in *State ex rel. Department of Revenue v. Driggs*, 178 Ariz. 389, 873 P.2d 1311 (Tax Ct.1994). The tax court relied in part on *Tucson Electric* to hold that DOR was estopped to assess a deficiency against taxpayers who had relied on erroneous information in calculating a deduction. *Id.* at 392, 873 P.2d at 1314. This court, however, vacated that decision. 189 Ariz. 74, 938 P.2d 469 (App.1996). Although the taxpayers had proved DOR's erroneous representations and their own reasonable reliance, we could not ignore the extensive body of authority that precludes estoppel against the sovereign. *Id.* at 77, 938 P.2d at 472. We cited that long history beginning with *Crane Co. v. Arizona State Tax Commission*, 63 Ariz. 426, 163 P.2d 656 (1945), *overruled on other grounds*, *Duhame v. State Tax Comm'n*, 65 Ariz. 268, 279, 179 P.2d 252, 259 (1947), in which our supreme court had proscribed estoppel on constitutional grounds. *Id.*

■ Under the Arizona constitution, "the power of taxation, (which must of necessity include collection) 'shall never be surrendered, suspended, or contracted away.' " *Crane*, 63 Ariz. at 441, 163 P.2d at 662. (quoting Ariz. Const. art. 9, § 1). Thus, when collecting revenue, the state acts in its governmental or sovereign capacity, "and ordinarily there can be no estoppel. Were this not the rule the taxing officials could waive most of the state's revenue." *Id.* In *Driggs*, we held that estoppel does not apply whenever DOR commits a "procedural" rather than "substantive" error because that distinction, "always elusive at the margins, provides especially little guidance in a field as procedure-bound as tax." 189 Ariz. at 78, 938 P.2d

at 473. Although in *Tucson Electric*, the court prohibited DOR from retroactively raising a procedural bar to the claim of a statutorily-granted deduction, "[t]he essential point, . . ., was that the . . . deduction *was* statutorily warranted." *Id.* In contrast, the taxpayers in *Driggs* sought "to preserve a mistakenly enlarged deduction and, thus, 'to [avoid], rather than [enforce], the basic intent of the statute.' " *Id.* We held that the *Crane* rule controlled. *Id.*

Here, as in *Driggs,* GM does not seek to estop DOR from contradicting earlier misinformation concerning a form or method of reporting or applying for a tax benefit. It seeks instead to force DOR to adhere to an earlier agreement about the statutory formula for calculating the actual amount of its tax liability. The agreement differs significantly from DOR's current regulation, which GM does not challenge as legally incorrect or beyond DOR's authority. In effect, GM asks us to estop DOR and, thereby, to avoid rather than to enforce the basic statutory intent by compelling the state to forego revenues to which it is legally entitled. We cannot do this under prevailing Arizona case law.

Our decision in *Arizona Department of Revenue v. M. Greenberg Construction*, 182 Ariz. 397, 897 P.2d 699 (App.1995), is consistent with our holding. In *Greenberg*, we rejected the taxpayer's argument that a line of published decisions of Division Two of the State Board of Tax Appeals ("BTA") supported its argument that DOR was estopped from including proceeds of construction jobs performed on Indian reservations in the taxpayer's contracting privilege tax base. *Id.* at 405, 897 P.2d at 707. We stated that DOR's change of position on the taxability of a particular kind of income was different from DOR's changing a reporting or accounting method for a multistate unitary business and that the BTA decisions did not apply. *Id.* Contrary to GM's contention, we did not approve the holdings of those decisions but distinguished them factually and did not decide whether they were legally correct. Their legal correctness is not before us now.

We conclude that the 1966 settlement agreement did not estop DOR from using 100 percent of GM's Arizona destination sales in

the numerator of the sales factor in accordance with former A.C.R.R. R15–2–138–8(b) and A.A.C. R15–2–1141.

## V. DEDUCTIBILITY OF COMMISSIONS PAID TO GM'S DOMESTIC INTERNATIONAL SALES CORPORATION (DISC) SUBSIDIARY

GM incorporated General Motors Export Corporation ("GMEC") as a wholly-owned subsidiary in 1920. In 1971, Congress enacted special rules for the operation of domestic international sales corporations ("DISCs") to stimulate American exports. *See* 26 U.S.C. §§ 991–997; *see also* 3 Boris I. Bittker and Lawrence Lokken, *Federal Taxation of Income, Estates and Gifts*, 2d ed., (Warren, Gorham & Lamont 1991), ¶ 68.1.3, at 68–5. In order to receive the statutory incentives, the DISC rules required GM to pay "commissions" to GMEC, calculated on a 50–50 combined taxable income method under 26 U.S.C. § 994.

Specifically, 26 U.S.C. §§ 991 through 997 of the I.R.C. initially taxed the income of a DISC solely to its shareholders: 50 percent as constructive dividends when earned by the DISC, whether distributed to shareholders or not, and the remaining 50 percent when actually distributed. *Id.* "Moreover, because the tax-deferred earnings could be loaned to the producer of the goods sold by the DISC (typically, its parent corporation) and invested in other assets relating to its export activities, the distribution of these earnings could frequently be put off indefinitely." *Id.* ¶ 68.1.1, at 68–3. A DISC needed no employees, equipment, or office. *Id.*, ¶ 68.1.3, at 68–7.

Further, "[g]iven the parasitic character … of the typical DISC," *id.*, Congress enacted intercompany pricing rules to "enabl[e] the DISC to obtain a specified share of their combined profit on the manufacture and sale of the goods, regardless of the sales prices actually charged" for the exported goods. *Id.* at 68–8. One method of calculating the DISC's share allocates to it "50 percent of the combined taxable income of the supplier

and the DISC plus 10 percent of the export promotion expenses." *Id.*

During the tax years 1976 through 1978, GM operated GMEC as a DISC. GM channelled foreign sales through GMEC, although the latter had no payroll or property and did no work. It was exempt from federal income taxes and incurred miscellaneous expenses of less than $1,700 per year, although it earned a gross export income of $144 million, $252 million, and $304 million, respectively, in tax years 1976 through 1978. GM paid GMEC "commissions" under the 50–50 combined taxable income method and deducted the GMEC payments from its Arizona gross income as "ordinary and necessary" business expenses. During those same tax years, Arizona had not yet adopted the 1978 Tax Act that treated federal taxable income as Arizona gross income for corporate taxpayers. Instead, the tax statutes specified the elements of Arizona gross income and the deductions necessary to yield Arizona taxable income independent of the taxpayer's federal return. Former A.R.S. §§ 43–101 through 43–199. Among those permissible deductions were "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business.…" Former A.R.S. § 43–123.03(A).[8] No statute or regulation, however, addressed the deductibility of DISC commissions. In the audit, DOR disallowed GM's deductions of DISC commissions, and the tax court upheld that action.

### A. Discussion

■ GM first contends that A.R.S. section 43–942 authorizes DOR to distribute, apportion, or allocate deductions among two or more related corporations but not to disallow them altogether. While GM's argument is superficially correct, DOR's authority to disallow income tax deductions flows ultimately from its authority to audit any state tax return and to assess tax deficiencies pursuant to A.R.S. section 42–117(A), (B), and (C). Even if DOR had mistakenly invoked

8. Beginning January 1, 1979, the Arizona business expense deduction was eliminated and effectively replaced by the federal business expense deduction reflected in federal taxable income (Arizona gross income).

A.R.S. section 43–942,[9] the authority derived from A.R.S. section 42–117 to disallow deductions remains.

GM next argues that the legislature clearly signalled its intent that contributions to DISCs be deductible from Arizona gross income in tax years before 1979 when it adopted A.R.S. section 43–1121(5) effective January 1, 1979. As of January 1, 1979, A.R.S. section 43–1121(5) directed that "commissions, rentals, and other amounts paid" to a DISC with no Arizona-source income be added to Arizona gross income (federal taxable income) in computing Arizona taxable income.[10]

GM invokes the presumption that when the legislature amends a statute, it intends to change existing law. *See, e.g., Trump v. Badet,* 84 Ariz. 319, 327 P.2d 1001 (1958). This principle is useful when the legislature changes a single provision within a discrete area of law. But when the amendment is only one of many comprehensive changes that transform an entire statutory scheme, it is a less reliable indicator of legislative intent. Here, GM can certainly argue that the enactment of A.R.S. section 43–1121(5) as part of the Arizona Income Tax Act of 1978 indicated an intention to change existing Arizona law and deny a deduction for DISC contributions that the legislature believed it had previously allowed. But because the Tax Act also for the first time used a gross income figure that considered the taxpayer's federal deductions of DISC contributions, one can equally argue that the legislature accordingly perceived a necessity to add DISC contributions back into Arizona gross income to maintain the nondeductibility of DISC contributions for Arizona income tax purposes. Therefore, the presumption does not resolve our interpretation of the pre–1978 law.

■ As an independent ground for reversal, GM argues that in disallowing GM's DISC contributions as ordinary and necessary business expenses, DOR was enforcing a blanket policy that should have been, and was not, promulgated as a rule pursuant to the Administrative Procedure Act, A.R.S. section 41–1001 *et seq.* *See* A.R.S. § 41–1030 (rule not properly adopted is invalid). GM argues that the disallowance was therefore invalid and that the tax court should have reinstated the deductions.

GM's argument assumes that DOR disallowed the DISC deductions based entirely on an invalid blanket policy to do so. GM cites an avowal of its counsel that "[t]he Department had a policy of disallowing all commissions paid to any wholly-owned DISC." GM's counsel also asserted that DOR had conceded in the tax court that a policy existed to disallow this deduction prior to the Income Tax Act of 1978.[11]

Our review of the record and the briefs belies GM's suggestion that DOR disallowed its DISC deductions based on an unpromulgated administrative policy. The initial decision by DOR's hearing officer on GM's administrative protest reveals that the audit section had disallowed the deduction on the ground that it had authority to allocate items of income and expense between related entities and to limit business deductions to those that were genuine ordinary and necessary expenses of business operation.

GM cites no authority for the proposition that partial reliance on an unpromulgated rule invalidates an administrative action when independent legal authority supports the action. A.R.S. section 41–1030 does not so provide, and the Arizona cases are more flexible than GM admits. In *Carondelet Health Services, Inc. v. AHCCCS,* 182 Ariz. 221, 228, 895 P.2d 133, 140 (App.1994), we held that the agency must promulgate a rule clarifying its interpretation of a statute used in setting hospital reimbursement rates. The agency policy was a *de facto* rule applied to all hospitals, and the statute was not so

---

9. We need not decide whether DOR's reliance on A.R.S. § 43–942 was in fact mistaken.

10. This had the effect of reversing for Arizona income tax purposes the deduction for those amounts provided by federal law in computing federal taxable income.

11. We have not found in the record on appeal the administrative filing from which GM derives this concession by DOR.

specific as to be self-executing. *Id.* at 228–29, 895 P.2d at 140–41.

We distinguished *Arizona Corporation Commission v. Palm Springs Utility*, 24 Ariz.App. 124, 536 P.2d 245 (1975), and the exception there created for special situations involving problems unforeseen or so variable that they could not fit under a general rule. *Carondelet*, 182 Ariz. at 229, 895 P.2d at 141. *Palm Springs* upheld a Corporation Commission order that a utility must supply water meeting federal quality standards, even though the Commission had not promulgated a rule or regulation to that effect. 24 Ariz. App. at 128, 536 P.2d at 249. We also stated that no express or implied prohibition barred the Commission from dealing with specialized situations case-by-case as long as it had "a rational statutory or constitutional basis" for its action and the action did not violate equal protection. *Id.* at 129, 536 P.2d at 250.

In this case, *Palm Springs* is the better authority because of the varied ways a corporation may operate a DISC and still qualify under 26 U.S.C. § 994(a). The treatment of a corporation's DISC contributions for Arizona income tax purposes is an area that is both narrow and complex. We do not agree that DOR's failure to promulgate a comprehensive regulation forfeited its statutory right to make audit determinations from a particular taxpayer's circumstances.

■ GM next contends that the tax court erred in declining to strike the affidavit of William Molina, whom DOR did not list as a witness in its initial disclosure statement. Ariz. R. Civ. P. 26.1. Molina is a DOR auditor who reviewed GMEC's returns for 1976 through 1978 in connection with DOR's response to GM's cross-motion for summary judgment. Citing *Allstate Insurance Co. v. O'Toole*, 182 Ariz. 284, 896 P.2d 254 (1995), GM argues that DOR willfully violated Rule 26.1 by failing to make a timely supplemental disclosure, that Molina's affidavit prejudiced GM, and that GM had diligently prosecuted the case.

■ GM fails to identify the standard that governs our review of this issue, as required by Rule 13(a)(6), Arizona Rules of Civil Appellate Procedure. Our review is confined to whether the tax court abused its discretion in implicitly denying GM's motion to strike the Molina affidavit. *Id.* at 287, 896 P.2d at 257.

Rule 26.1(c) provides:

> In addition to any other sanction the court may impose, the court shall exclude at trial any evidence offered by a party that was not timely disclosed as required by this rule, except by leave of court for good cause shown, and no party shall be permitted to examine that party's witness to prove facts other than those identified in the written disclosure to the party's opponents except by leave of court for good cause shown.

GM filed its complaint on February 11, 1994. DOR and GM exchanged disclosure statements on or about April 22, 1994. Among the documents DOR listed were "[a]ll documents and other demonstrative materials produced or identified by the parties." In response to an informal DOR request, GM's counsel delivered copies of GMEC's federal tax returns to DOR on October 17, 1994.

On February 14, 1995, DOR filed its motion for summary judgment, together with an affidavit of auditor Todd Hoggatt. Hoggatt stated in essence that GMEC had no employees or property during 1976 through 1983; that it was conceived only for federal tax law purposes; that GM employees continued to perform the same functions related to international trade as before GMEC's formation; that GM's commissions to GMEC had no purpose other than securing federal tax savings; and finally, that shifting GM's profits to GMEC "served no helpful business purpose."

In support of its cross-motion for summary judgment, GM submitted J. Hugh McKinnon's affidavit. McKinnon averred in part that GM paid commissions as compensation for GMEC's role in selling GM products abroad and that from 1976 to 1978 "GMEC had some expenses associated with the sale of products."

On April 21, 1995, DOR submitted its response to GM's cross-motion for summary judgment, supported by the affidavit of Moli-

na. Based on GMEC's returns, Molina averred in relevant part that GMEC "has no substance in terms of the sale of export property," performed "no services relating to export sales of GM product, and had no payroll or property." Its income consisted of the artificial commissions required by federal law although GM did all the work and incurred the actual expenses related to export sales. Finally, he stated that GMEC's returns show that GMEC incurred no expenses related to export sales.

■■■■ Under *Allstate Insurance Co.*, the trial court determines whether good cause exists for permitting use of untimely disclosed evidence, with the goal of maximizing the likelihood of a decision on the merits. 182 Ariz. at 287, 896 P.2d at 257. A party's reason for late disclosure is a factor in good cause, but the court may also consider any prejudice to each side from exclusion or use of the evidence, any action by the parties to correct the problem, and the parties' diligence in prosecuting the case. *Id.* at 288, 896 P.2d at 258.

We find no abuse of the tax court's discretion in failing to strike Molina's affidavit. Granted, Molina was not disclosed as a witness, and DOR had obtained copies of GMEC's federal tax returns in October, long before it submitted Molina's affidavit. DOR also failed to make a supplemental Rule 26.1 disclosure of his testimony. But, the trial court could have concluded that DOR was not likely to foresee that GM would claim business deductions based on assertions seemingly contradicted by GMEC's own returns.[12] The court also reasonably could have found no unfair prejudice to GM. GMEC's returns for 1976 through 1978 were arguably within the scope of DOR's initial Rule 26.1 disclosure, and GM does not contend otherwise. The returns clearly reveal that GMEC claimed no export promotion expenses in any of those years; Molina's affidavit primarily notes this fact. Moreover, GM's motion to strike conceded that "Mr. Molina's 'review' is, at best, nothing more

than an after the fact repetitive rehash of Mr. Hogatt's [sic] testimony, which GM disputed in its Cross Motion and Reply of March 20, 1995."

Finally, the affidavit focused on inferences drawn from GMEC's 1976 through 1978 returns, which appeared to contradict assertions of GM's affiant, McKinnon. GM had over a month before oral argument on the cross-motions for summary judgment to seek time to counter the Molina affidavit or to offer a controverting affidavit. It did neither. GM's motion to strike was not intended to encourage a decision on the merits, and thus the tax court's failure to strike the affidavit was not an abuse of its discretion.

■■■■ We now turn to the merits of GM's deductions. GM contends that its commission payments to GMEC in 1976 through 1978 were ordinary and necessary expenses of carrying on its business and deductible from its Arizona gross income pursuant to former A.R.S. section 43–123.03(A). It reasons that the commissions were ordinary and necessary because the DISC program increased GM's exports as intended, and thus payment of the commissions was necessary. GM also notes that GM paid the commissions on the 50–50 combined taxable income method approved by the Internal Revenue Service and that GM dealt with GMEC at arm's-length.

■■■■ We cannot agree. Under Arizona's pre–1979 income tax statutes, a payment of money was an ordinary and necessary business expense in Arizona only if (1) it was incurred in connection with maintaining or operating the taxpayer's business, (2) the expense was ordinary, and (3) the expense was necessary. *Arizona Dep't of Revenue v. Transamerica Title Ins. Co.*, 124 Ariz. 417, 422, 604 P.2d 1128, 1131 (1979); *Arizona State Tax Comm'n v. Kieckhefer*, 67 Ariz. 102, 107, 191 P.2d 729, 732 (1948). GM's payments to GMEC were not "ordinary and

---

12. For example, McKinnon's affidavit stated, "GMEC had some expenses associated with the sale of products." Given the assertions against which McKinnon and GM directed this statement—that GMEC was a paper corporation and did nothing to further the export of GM's products—McKinnon's statement more likely suggests that GMEC actually engaged in export activity and incurred direct expenses.

necessary business expenses" because they were not true expenses at all.

The tax incentives enacted in the DISC legislation in effect enabled the taxpayer-exporter to defer federal income taxes on a quarter of its export income indefinitely while also having the use of that income through loans from its DISC. See Bittker & Lokken, *supra,* ¶ 68.1.1 at 68–3. By taking advantage of these incentives, GM accordingly paid GMEC "commissions" under the 50–50 combined taxable income method. This meant that regardless of the prices GMEC received for the GM goods it exported or what services it did or did not perform, GM paid GMEC exactly half the combined income GMEC received on GM's behalf from the exports. Half of the sum thus paid to GMEC (a quarter of the total export income) was taxed to GM immediately as a constructive dividend, and the remaining half was taxed to GM when and if it received distributions from GMEC in excess of the half on which it had already paid income taxes.

By paying commissions to GMEC, GM was not satisfying obligations it had incurred in maintaining or operating its business. It was placing its own money in a temporary tax shelter. The Supreme Court of Minnesota similarly concluded that a DISC serves no real business purpose but that DISC commissions "are essentially an assignment of income to [the DISC] in order to shelter one quarter of [the taxpayer's] export business

profits from federal income tax. Payments made to discharge obligations created as a result of an assignment of income cannot be regarded as ordinary and necessary business expenses." *Bunge v. Commissioner of Revenue,* 305 N.W.2d 779, 783–84 (Minn.1981).

The tax court did not err in sustaining DOR's disallowance of GM's deductions for commissions paid to GMEC for tax years 1976 through 1978.

## VI. TAXABILITY OF APPORTIONED SHARE OF GM'S PATENT ROYALTIES

■ As part of its business during 1976 through 1983, GM developed, held, and licensed patents. Each year, GM deducted an apportioned share of its patent development expenses in calculating its Arizona taxable income but allocated to Michigan all of the royalties derived from its patents. DOR determined that GM used its patents in a multistate unitary business and that its total royalties from those patents should properly be apportioned among Arizona and the other states in which GM operated. DOR accordingly assessed Arizona income taxes on a share of GM's total patent royalties apportioned to Arizona by standard formula.

During 1976 through 1983, former A.R.S. section 43–135(g) (1976 through 1978) [13] and a virtually identical successor statute, A.R.S. section 43–1141 (1979 through 1983),[14] gov-

---

**13.** Former § 43–135(g) provided:

When the income of a corporation . . . is derived from or attributable to sources both within and without the state, the tax shall be measured by the net income derived from or attributable to sources within this state. Such income shall be determined by first deducting from the income of the taxpayer such part thereof, less related expenses, as follows the situs of the property . . . (provided, that the amount of interest and dividend income deductible under this provision as following the situs of the property . . . shall be limited to the total interest and dividend income received in excess of the total interest, expenses and related expenses). The income attributable to sources within this state shall then be determined by (1) separate accounting thereof when requested by the taxpayer or required by the department to more clearly reflect the income of the taxpayer, or, (2) an apportionment upon the basis of sales, purchases, expenses of manufacture, payroll, value and situs of tangible property . . . or by reference to any . . . other factors . . .

fairly calculated to determine the net income derived from or attributable to sources within this state, provided that in no case shall the tax be less than would result from the use of the apportionment method. Income from business carried on partly within and partly without this state shall be apportioned in such a manner as is fairly calculated to apportion such income among the states . . . in which such business is conducted. Income attributable to isolated or occasional transactions in states . . . in which the taxpayer is not doing business shall be allocated to the state in which the taxpayer has its principal place of business or commercial domicile.
. . . .

A.R.S. § 43–135(g), *repealed by* 1978 Ariz. Sess. Laws Ch. 213, §§ 1, 2.

**14.** A.R.S. § 43–1141, *repealed by* 1983 Ariz. Sess. Laws Ch. 287, §§ 4, 5 (current version at A.R.S. §§ 43–1131 through 43–1150 (Supp.1996)).

erned the allocation and apportionment[15] of the income of multistate corporations operating in Arizona. Both sections required that net corporate income that "follows the situs of the property" generating it be deducted from the taxpayer's income and that the balance of net income then be apportioned among Arizona and the other states in which it was earned.

In assessing the tax deficiencies on GM's patent royalties, DOR relied on the regulatory interpretation of former A.R.S. sections 43–135(g) and 43–1141(A) contained in former A.C.R.R. R15–2–135–8 and A.A.C. R15–2–1141. Both regulations reflected the principles that (1) a foreign corporation's income from intangible personal property not used in a multistate unitary business ("non-business income") was exclusively Arizona-source income; (2) for a corporation not commercially domiciled in Arizona, income from intangible personal property was Arizona-source income only if the property was employed as capital in Arizona, or its possession and control was so localized that the property became an asset of the Arizona business; and (3) all income from intangible personal property used by a foreign corporation in operating a multistate unitary business ("business income") was subject to apportionment between or among Arizona and other states in which the taxpayer operated the unitary business.

GM argues that the legislature repealed former A.R.S. section 43–1141 and replaced it with a new act derived from the Uniform Division of Income Tax Purposes Act ("UDITPA") that uses a business/nonbusiness income criterion in determining whether to apportion or to allocate. A.R.S. §§ 43–1131 through 43–1150. GM thus argues that the legislature must have intended to change prior law and that the new act means that DOR did not consider the unitary business concept in the allocation and apportionment process under pre-amendment law. Because DOR's regulatory interpretation of the pre-amendment law was effective many years before the new statute and the legislature was likely

well aware of it, we cannot agree with GM. One can as easily argue that in adopting a version of UDITPA, the legislature simply confirmed DOR's correct interpretation.

We now turn to GM's request for reversal. Both earlier versions of A.R.S. sections 43–135(g) and 43–1141 required that net corporate income that "follows the situs of the property" generating it be deducted from the taxpayer's income and that the balance of net income then be apportioned among Arizona and the other states in which it was earned. Relying on 1 Jerome R. Hellerstein and Walter Hellerstein, *State Taxation*, ¶ 9.7 (1st ed.1983), GM asserts that patent royalties follow the situs of specific property, here presumably the patents themselves. GM thus argues that its royalties should be excluded entirely from the apportionment formula and not taxed by Arizona at all.

GM cites the Hellerstein treatise to contend that a patent has a single business situs and that all of its income should be allocated to the situs state. The treatise provides: "Traditionally, rents, *royalties* and capital gain or loss from the sale or exchange of real property were allocated by most States to the location of the property. That rule obtains at present in a number of States." *Id.* at 499; *see also id.* ¶ 9.07, at 9–5 (2d ed.). GM evidently interprets this language as classifying patents with other property that has physical location.

■ The quoted language, however, neither expresses nor supports that notion. The language appears in a chapter on allocation and apportionment of income from real and tangible personal property, and thus the reference to "royalties" pertains to royalty interests in such personal property. *See id.* ¶ 9.07, at 9–25, 9–26 and n. 75 (2nd ed.). Hellerstein expressly recognizes that intangibles like patents and copyrights have no physical location. *Id.* ¶ 9.02, at 9–7, 9–10. Accordingly, we are not persuaded that a patent necessarily has a single discrete situs that the patent income can follow or that

---

**15.** In state taxation of multistate businesses, allocation refers to attributing all of a particular type of income or property to a designated state, while apportionment refers to dividing the tax

base between or among states by formula. *See* 1 Jerome R. Hellerstein and Walter Hellerstein, *State Taxation*, ¶9.1, at 9–5, n. 1 (1st ed.1983).

patent royalties are income of the type that must be removed from the taxpayer's total income pursuant to former A.R.S. sections 43–135(g) and 43–1141(A) before calculating a ratio for apportionment of income to Arizona.

Even aside from the foregoing analysis, GM's contention that former A.R.S. sections 43–135(g) and 43–1141(A) were too narrow to allow DOR to engraft the unitary business concept onto them by regulation is unconvincing. The meaning of "income [that] follows the situs of the property" is not necessarily clear from the statutes alone; neither characterized the nature of such income for purposes of allocation and apportionment. Thus, the legislature may well have left that issue for regulatory interpretation.

Further, DOR's interpretation of "income [that] follows the situs of the property" as taxpayer income not earned in operating a multistate unitary business is consistent with the practices of other states to apportion a multistate taxpayer's "business income" among the states in which it operates, but allocate "non-business income" to the taxpayer's commercial domicile or to the business situs of the income-producing asset. *See id.* ¶¶ 9.04, 9.05, at 9–18 through 9–21. Hellerstein notes that many states treat income from rents, royalties, dividends, patents, and copyrights not used in connection with a unitary corporate business as "nonbusiness income." *Id.* ¶ 9.05, at 9–21.

We conclude that the former regulations quite reasonably interpreted "income [that] follows the situs of the property" as income from intangible income-producing property not used in operating a taxpayer's multistate unitary business and thus attributable either to the taxpayer's commercial domicile or to the business situs of the property or rights that generated the income. The regulations just as reasonably recognized that, virtually by definition, intangible income-producing property that a taxpayer puts to use in generating the net income of its multistate unitary business cannot be said to have a single situs to which all the income from that property may be assigned. Such an asset becomes part of the overall unitary business, and the income it generates merely a component of the business' total income. As such, it can be fairly taxed only by apportionment among the states in which the unitary business operates. That is precisely what DOR did in assessing Arizona income taxes on a share of GM's patent royalties here.

▆▆▆▆ In the final section of the reply brief, GM urges alternative arguments aimed at demonstrating that even if former A.A.C. R15–2–1141 validly interpreted former A.R.S. section 43–1141(A), the regulation's language rendered it inapplicable here. A contention on which an appellant seeks affirmative relief on appeal should be raised, if at all, in the opening brief. *Amfac Distrib. Corp. v. J.B. Contractors, Inc.,* 146 Ariz. 19, 27, 703 P.2d 566, 574 (App.1985). We decline to consider them. *See United Bank v. Mesa N.O. Nelson Co.,* 121 Ariz. 438, 443, 590 P.2d 1384, 1389 (1979); *Anderson v. Country Life Ins. Co.,* 180 Ariz. 625, 636, 886 P.2d 1381, 1392 (App.1994).

The tax court did not err in sustaining DOR's assessment of Arizona income taxes on an apportioned share of GM's patent royalties.

## VII. SUMMARY

We affirm the grant of summary judgment to DOR on the grounds that:

(1) DOR correctly disallowed GM's deductions for its contributions to its Employee Stock Ownership Plan from 1979 through 1983;

(2) properly used 100 percent of GM's Arizona destination sales in calculating the sales component of the three-factor formula for allocating a share of GM's total income to Arizona for tax years 1978 through 1983;

(3) correctly disallowed GM's deductions in tax years 1976 through 1978 for shares of GM export income that it assigned to GMEC, its domestic international sales corporation; and

(4) correctly apportioned and taxed as Arizona-source income a share of GM's patent royalties during tax years 1976 through 1983.

GARBARINO, P.J., and WEISBERG, J., concur.