962 P.2d 230

The **SHELBY SCHOOL**, a non-profit Arizona corporation; Dr. Gary W. Moore, applicant, Plaintiffs–Appellants,

v.

**ARIZONA STATE BOARD OF EDUCATION**, Defendant–Appellee.

No. 1 CA–CV 97–0075.

Court of Appeals of Arizona, Division 1, Department B.

June 18, 1998.

Rensch & Walker by Steven R. Rensch, Payson, for Plaintiffs-Appellants.

Grant Woods, Attorney General by Ruth E. Koester, Assistant Attorney General and Roger W. Hall, Assistant Attorney General, Phoenix, for Defendant-Appellee.

## OPINION

KLEINSCHMIDT, Judge.

¶ 1 The Arizona State Board of Education denied a charter to the Shelby School for the 1995–96 school year. The School and one of its directors, Dr. Gary W. Moore, appeal from the trial court's ruling upholding

---

the administrative decision. We reverse in part and remand to the Board for further proceedings because the Board did not make findings and conclusions as required by statute.

## FACTS AND PROCEDURAL HISTORY

¶ 2 In 1994, the Arizona Legislature authorized the establishment of charter schools "to provide a learning environment that will improve pupil achievement" and to "provide additional academic choices for parents and pupils." Ariz.Rev.Stat. Ann. ("A.R.S.") § 15–181(A) (Supp.1995). *See* 1994 Ariz. Sess. Laws S–17, S–17 to S–24, which added A.R.S. §§ 15–181 to 15–189. A charter school is a public school that operates under a charter contract between a sponsor, which may be a school district governing board, the State Board of Education, or the State Board for Charter Schools, and a public body, private person, or private organization. A.R.S. §§ 15–101(3), 15–183(B) (Supp.1997). The authorized sponsors "may" establish charter schools under the legislation, and, as the law was originally written, the State Board of Education and the State Board for Charter Schools could each sponsor up to twenty-five charter schools each fiscal year. A.R.S. §§ 15–181(A), 15–183(C)(2) (Supp.1995). Under the current version of A.R.S. section 15–183(C)(2) (Supp.1997), the State Board of Education and the State Board of Charter Schools may each "approve" up to twenty-five charter schools each fiscal year.

¶ 3 A charter school applicant submits a written proposal or application to a sponsor. A.R.S. § 15–183(A). Under the original statute, which was in effect when the application relevant to this appeal was filed, "[t]he state board of education or the state board for charter schools shall review the application submitted by the applicant within ninety days and may approve the charter if the application satisfactorily meets the requirements of this article." A.R.S. § 15–183(C)(2) (Supp.1995).[1] The charter must ensure that

---

1. In 1995, the legislature amended A.R.S. § 15–183(C)(2) to provide as follows:

 The state board of education or the state board for charter schools may approve the application if the application meets the requirements

 of this article and may approve the charter if the proposed sponsor determines, within its sole discretion, that the applicant is sufficiently qualified to operate a charter school. The state board of education or the state board for

the school will comply with a number of specifications as set forth in A.R.S. section 15–183(E).

¶4 The legislature authorized public funding for qualifying charter schools. A.R.S. §§ 15–181(B), 15–185 (Supp.1997). Schools sponsored by the State Board of Education or State Board for Charter Schools receive funds under a formula that includes base support, transportation support, capital outlay revenue limits, and capital levy revenue limits. A.R.S. § 15–185(B).

¶5 The Shelby School is located in Tonto Village, a rural community about seventeen miles from Payson. The School opened in September 1994 with forty-four students. Although the predecessor school had been formed by the Church of Immortal Consciousness, the Shelby School was described as a non-profit, tax-exempt corporation and non-sectarian school.

¶6 In December 1994, the School applied for a charter from the State Board of Education. Its proposal was submitted by Gary W. Moore, Ph.D., the director of education for the School. The Board unanimously approved the School's application in February 1995.

¶7 Shortly thereafter, Dr. Linda Fuller, the charter schools administrator for the Board, notified charter school applicants that the Board had decided to request additional information before it entered into a charter contract with any school. To that end, each applicant was required to complete and sign a form on which the applicant was to disclose any criminal history and was to grant permission for reference and credit checks. Dr. Fuller's memorandum advised that the Board would be asked to approve contracts for applicants that had obtained full approval of their applications and for whom background information had been obtained that met the standards acceptable to the Board. The four proposed members of the School's governing board, including Dr. Moore and Charles Walker, promptly returned completed forms and fingerprint cards.

charter schools may each approve up to twenty-five charter schools each fiscal year.

¶8 On March 27, 1995, the Board voted to issue charter school contracts to fourteen applicants, including the School. Issuance of each contract, however, was conditioned upon the Board's receipt of a Statement of Assurances, a favorable background investigation, and upon the applicant securing a facility. At that meeting, a Board member explained that the granting of a charter involved a three-step process—approval of the application, entering into the charter contract, and grant of stimulus funds—and that each step was independent of the other. He noted that the fact that the Board approved an application and that the application was technically complete did not necessarily have any bearing on whether the school would receive a charter.

¶9 During March, the Board staff received written and oral communications from some people in Tonto Village who objected to the issuance of a charter for the School. They primarily complained about the lifestyle and religious beliefs of the people associated with the School and about the inconvenience and tax increases they believed would occur if the charter were granted. As a result of these complaints, the Board staff instructed the private investigative agency that was running the credit checks to also look into the background of the church and Dr. Moore's connection with it.

¶10 Dr. Fuller advised Dr. Moore that his credit report showed a number of unpaid debts and liens. Dr. Moore contacted the credit bureau concerning inaccuracies in the report and items that should have been updated, and he provided that information to Dr. Fuller.

¶11 On May 22, 1995, after meeting in executive session, the Board unanimously denied a charter to the School "based upon the unacceptable financial history as reflected in the credit report." The Board did not publicly discuss or comment on its decision. Moore and Walker were present and were both given the opportunity to speak. Moore spoke briefly to the Board, noting that he intended to take care of his few remaining debts. Walker did not address the Board.

*See* 1995 Ariz. Sess. Laws 2213, 2213. This amendment took effect on July 13, 1995.

¶ 12 Within a week of the decision, both Moore and Walker informed the Board that they had resigned from the School's board of directors because they did not want their credit histories to interfere with the School receiving a charter. The School submitted a revised application that substituted two new board members for Moore and Walker. However, Moore continued to be the official applicant for the charter and the director of education for the School.

¶ 13 The School filed a motion for rehearing and/or review under Rule 2–7–806, Arizona Administrative Code. The Board advised the School that it would reconsider its decision on June 26, 1995, and that the School could submit materials to the Board related to the unfavorable information contained in the credit report.

¶ 14 At the June 26 session, the Board tried to determine whether the School had received the documents considered by the Board in reaching its decision in May. The Board members indicated they had reviewed only the credit reports on the applicant and proposed governing board members, but Moore believed the Board staff had investigative reports that had not been provided to him. To ensure that the School had all the relevant documents, the Board voted to table the rehearing/reconsideration of its decision concerning the School until its August meeting. The Board advised the attorney for the School that at the August meeting it would review the financial status of the applicants it considered at its May 22 meeting.

¶ 15 Also at the June 26 meeting, the Board determined that it could not consider the new application submitted by the School because the substitution of two new board members was a material change from the information submitted by the School in its initial application. The Board noted that to be consistent with the way it treated other applicants, the School would have to begin the approval process again if it wanted its amended application to be considered.

¶ 16 Prior to the August meeting, Moore submitted letters and documents to show that the entries on the March 17, 1995 credit report represented either positive information, reporting mistakes, or debts incurred as the result of family medical expenses not covered by insurance that had been paid or were the subject of payment arrangements with the creditors. At the meeting, Moore explained the information he had submitted and argued that the School was viable financially and was not affected by his credit history. Walker did not appear before the Board.

¶ 17 The Board voted unanimously to reaffirm its decision to deny a charter to the School. In making the motion to reaffirm the decision, State School Superintendent Lisa Graham Keegan, a member of the Board, commented:

> We have a history in this process of charter schools of a review of applicants [sic] financial history. I think that is an appropriate review.... Our boss is approximately 4 million people who live in the State of Arizona and I believe this Charter Board does a good job of being responsible to that public.... [T]he credit history here demonstrates some struggle in managing finances. I would congratulate the applicant that those things are being paid off. I think that's appropriate and it's the responsible thing to do but it remains a fact that there is substantial stress at this time that has to be handled. I do not think that that's the appropriate way for us to walk into a brand new school endeavor. I think it is thoroughly appropriate, as we have done in the past, to say this is not the right time for this applicant; it does not seem an appropriate time to approve this school.

¶ 18 The Board issued a written notice of its final decision denying the issuance of a charter contract for the School. It noted that its decision was made "in consideration of the record of this and all previous proceedings, including all materials and documents filed by the applicant, the State Board of Education and the Arizona Department of Education."

¶ 19 The School and Dr. Moore filed a complaint in superior court seeking review of the Board's decision. The trial court affirmed the decision. The court found that the Board is statutorily charged with deter-

mining which applicants are best suited academically and financially to run a charter school and that it is vested with broad discretion in that regard. Noting that the Board was limited to awarding no more than twenty-five charters each fiscal year, the court found that given the large number of applicants, the Board "must rationally establish criteria upon which it may reasonably and fairly discriminate between applicants." The court reasoned that even though the statute did not mandate the creditworthiness requirement, such a requirement was well within the Board's discretion and did not constitute rule making within the parameters of the Administrative Procedure Act, A.R.S. section 41–1001 *et seq.*

¶ 20 The School and Dr. Moore timely appealed from the trial court's judgment.

## THE BOARD'S FINDINGS WERE INADEQUATE

¶ 21 The Appellants argue that the Board's final decision was insufficient because it failed to make findings of fact or conclusions of law, as required by A.R.S. section 41–1063. The statute specifically provides that decisions which fall within its purview must also include "a concise and explicit statement of the underlying facts supporting the findings." *Id.* The facts required to be found by the agency are basic facts, facts upon which the ultimate finding rests. *Civil Serv. Comm'n v. Livingston,* 22 Ariz.App. 183, 188–89, 525 P.2d 949, 954–55 (App.1974). The findings need not be detailed nor in any particular form, though the reviewing court must be able to discern how the agency reached its conclusion. *Post v. Industrial Comm'n,* 160 Ariz. 4, 8–9, 770 P.2d 308, 312–13 (1989). An administrative agency's findings must be explicit enough to allow the court to intelligently review the agency's decision and to decide whether there is a reasonable basis for the decision. *Hatfield v. Industrial Comm'n,* 89 Ariz. 285, 288, 361 P.2d 544, 547 (1961).

¶ 22 In the notice of its final decision, the Board stated that its decision to deny issuance of the charter was made "in consideration of the record of this and all previous proceedings, including all materials and documents filed by the applicant, the State Board of Education and Arizona Department of Education." The Board failed to make basic findings of fact or conclusions of law and simply provided a conclusory statement as the basis for its decision. The decision does not provide us with the facts upon which it is based and "falls far short of the type of dispute resolution the statute requires for administrative decisions...." *See Post,* 160 Ariz. at 8, 770 P.2d at 312 (where the administrative law judge made no findings and merely "considered the evidence in its entirety").

¶ 23 The Board on one hand asserts that it relied upon the Moore and Walker credit reports as the basis for its decision, yet, on the other hand, it cites to the entire record as the basis for its decision. It is difficult to discern from the record before us whether the Board's decision was based on the Moore or Walker credit report, or both, whether the corrections and changes to the Moore report were considered, and whether the decision was based on other impermissible considerations such as religion or public hostility.

¶ 24 The requirement for findings and conclusions is no mere formality. 3 KENNETH CULP DAVIS, ADMINISTRATIVE LAW TREATISE, §§ 16.01–.14 (2d ed.1980). Such a requirement protects against careless or arbitrary action, facilitates judicial review, keeps agencies within their jurisdiction, aids parties' preparation of cases for rehearing and judicial review, and prevents judicial usurpation of administrative action. *Id.* § 16.05.

¶ 25 The need for findings of fact in this case is particularly compelling because the parties associated with the Shelby School appear to have been unpopular to some in the community because of their beliefs and practices. Because this is an area of significant public interest with public funds at stake, where the Board was vested with broad discretion in granting charters, and where much of the deliberation involving the School occurred behind closed doors, it is important to know the precise basis for the Board's decision.

¶ 26 Our conclusion brings us to the question of appropriate relief. The Appellants request that we direct the Board to issue a charter and that we award them the amount of money to which they would have been entitled if the charter had been issued at the time it was applied for. This we cannot do. The decision to issue a charter is not ours to make. *See Arizona Corp. Comm'n v. Fred Harvey Transp. Co.*, 95 Ariz. 185, 190, 388 P.2d 236, 239 (1964) (court cannot supersede essential function of another public body) and *State Board of Dispensing Opticians v. Carp*, 85 Ariz. 35, 38, 330 P.2d 996, 998 (1958). Since we cannot say that the Board abused its discretion in denying a charter, it would be inappropriate to order the Board to pay the Appellants the money they have requested.

¶ 27 We take judicial notice of the fact that the membership of the Board has changed since the request for a charter was denied. For that reason, it is impossible to remand with directions to issue adequate findings and conclusions. We think the most appropriate remedy is to remand to the Board for further consideration. Given the passage of time, the Appellants should be allowed to supplement the record and reargue their request for a charter. The Board may then make its decision, which it must support with adequate findings and conclusions.

## THE BOARD PROVIDED ADEQUATE NOTICE OF THE CREDITWORTHINESS REQUIREMENT BUT ERRED IN REFUSING TO ALLOW A REVISION OF THE APPLICATION

¶ 28 The Appellants also argue that the Board's decision was unfair because neither they nor any other applicant had any notice of the creditworthiness requirement. They also contend that the creditworthiness requirement was not proper because it was not authorized by statute.

¶ 29 We agree with the trial court that it would have been preferable for the Board to have adopted specific standards concerning the requirement for a financial background investigation as a condition precedent to the awarding of a charter. However, as noted by the trial court, "an administrative agency has considerable discretion as to whether it will choose to proceed in making policy by regulation or by *ad hoc* adjudication." Generally, agencies should promulgate rules and regulations of general applicability rather than generating policy in a piecemeal fashion though individual orders. *Arizona Corp. Comm'n v. Palm Springs Utility Co.*, 24 Ariz.App. 124, 128–29, 536 P.2d 245, 249–50 (1975). However,

> any rigid requirement to that effect would make the administrative process inflexible and incapable of dealing with many of the specialized problems which arise.
>
> . . . .
>
> In those situations, the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective. . . . [T]he choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency.

*Id.* at 129, 536 P.2d at 250 (quoting *Securities and Exchange Comm'n v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)).

¶ 30 This discretion is particularly important where, as here, an agency performing a new function was in the process of developing criteria to implement new legislation. The School's application was filed in the first year the Board considered such applications. It was not unreasonable for the Board to add requirements during the application process as it learned what information it needed to make informed decisions on awarding charters. Certainly it was reasonable for the Board to determine the financial reliability of persons who would be receiving large sums of state money. All applicants were subject to the credit check requirement, and Dr. Moore and the other board members of the School did not object thereto.

¶ 31 We agree with the School, however, that it should have been allowed to revise its application once a question of creditworthiness arose relating to the credit histories of several members of the School's

board. The School relies on A.R.S. section 15–183(C)(2), which at the pertinent time read in relevant part:

> If the state board of education or the state board for charter schools rejects the preliminary application, the state board of education or the state board for charter schools shall notify the applicant in writing of the reasons for the rejection and of suggestions for improving the application. An applicant may submit a revised proposal for reconsideration by the state board of education or the state board for charter schools. The applicant may request, and the state board of education or the state board for charter schools may provide technical assistance to improve the application.

¶ 32 The Board points out that this proviso applies only to the preliminary application and that at the time the School requested permission to submit its amendment its preliminary application had already been approved. However technically correct the Board may be, under the facts of this case it was a clear abuse of discretion for the Board to decline to consider the requested change. The Board first added the criteria relating to creditworthiness after the School's application had been completed and approved. Surely if the Board had the inherent power to add this criterion, it had the inherent power to allow changes to an application to meet problems that might arise in the consideration of creditworthiness.

¶ 33 Indeed, the School points to other charter school applicants that were permitted to amend their applications to make changes in curriculum or financial matters. We see nothing so fundamentally different or disruptive about changes in the membership of the School's board that would preclude consideration of the proposed change.

## THE BOARD DID NOT EXCEED ITS POWER IN DENYING A CHARTER BASED ON POOR CREDITWORTHINESS

¶ 34 Appellants next argue that the Board had no statutory basis to deny the School a charter other than the failure to satisfy the requirements of A.R.S. section 15–183(E), and the School satisfied those requirements. They contend that because none of the criteria in section 15–183(E) refer to creditworthiness, the Board did not have the power to deny the charter on that basis.

¶ 35 It is true, as Appellants argue, that "the powers and duties of an administrative agency are measured and limited by the statute creating it." *Arkules v. Board of Adjustment of Paradise Valley,* 151 Ariz. 438, 440, 728 P.2d 657, 659 (App.1986). However, "when authorized to do so by the legislature, administrative bodies may make supplementary rules for the complete operation and enforcement of legislation. These rules are within the standards set forth in the legislative act." *Boyce v. City of Scottsdale,* 157 Ariz. 265, 268, 756 P.2d 934, 937 (App.1988). Both the Board and the State Board for Charter Schools have been authorized by the legislature to adopt or make rules for their own government and determine their policy and the work undertaken by them. A.R.S. §§ 15–203(A)(3)–(4), 15–182(E)(5)–(6).

¶ 36 This legislative authorization allows the Board to make rules and policies concerning the criteria it will apply in granting charters. For example, a school charter must ensure that the school is subject to certain financial requirements, A.R.S. § 15–183(E)(6); each charter school must calculate a base support level and a transportation support level, A.R.S. § 15–185(B)(1); charter schools must secure insurance for liability and property loss, A.R.S. § 15–183(M). Before granting a charter, the Board must have some means of determining whether an applicant has a financial history that indicates competence in managing finances and related issues. Obtaining a credit history would be one means of evaluating an applicant's financial abilities. Thus, we conclude that the charter act, taken together with the statute setting forth the powers of the Board, allowed the Board to impose a creditworthiness requirement for charter school applicants.

## THE BOARD DID NOT VIOLATE THE ADMINISTRATIVE PROCEDURES ACT BY FAILING TO GIVE NOTICE

¶ 37 Appellants argue that the Board violated A.R.S. sections 41–1061 and 41–1065 of

the Administrative Procedures Act with respect to the May 22 and August 28 sessions because it failed to give them adequate notice of the May 22 session and it gave the school no opportunity to be heard.

¶ 38 The Administrative Procedures Act did not apply to the May 22 session. The Act applies to "contested" cases. *See* A.R.S. § 41–1061(A). A "contested case" is defined in the Act as "any proceeding, including rate making, price fixing and licensing, in which the legal rights, duties or privileges of a party are required by law to be determined by an agency after an opportunity for a hearing." A.R.S. § 41–1001(4) (Supp.1995).

 ¶ 39 The charter schools statutes do not give an applicant a right to a hearing on the initial approval of either the application or charter. The only administrative hearing provided for is upon determination by the sponsor that grounds exist to revoke a charter. A.R.S. § 15–183(R). This provision could not have applied to the May 22 session because no charter had been granted to the School; therefore, no determination to revoke a charter could have existed. Accordingly, no "contested case" existed in the School's charter application proceedings as of May 22, and the rules of the Administrative Procedures Act did not apply to that session.

¶ 40 Once the Board denied a charter to the School, however, the School was entitled to a hearing on that denial under the Administrative Procedures Act. Arizona Revised Statutes section 41–1065 provides:

> Proceedings for licenses[2] or permits on application when not required by law to be preceded by notice and opportunity for hearing shall be governed by the provisions of the law relating to the particular agency, provided that when an application for a license or permit is denied under the provisions of the law relating to a particular agency the applicant shall be entitled to have a hearing before such agency on such denial upon filing within fifteen days after receipt of notice of such refusal a written application for such hearing. Notice shall be given in the manner prescribed by § 41–1061. At such hearing such applicant

shall be the moving party and have the burden of proof. Such hearing shall be conducted in accordance with this chapter for hearing of a contested case before an agency. Such hearing before such agency shall be limited to those matters originally presented to the agency for its determination on such application.

¶ 41 The Appellants acknowledge that the School received notice of the time and place of the August 28 hearing as required by A.R.S. section 41–1061(A), but they argue that the notice did not include a statement of legal authority, a description of the standards to be applied by the Board, or a statement of the matters asserted or issues involved other than "unfavorable credit information."

 ¶ 42 The trial court did not specifically deal with this argument in its ruling, although by implication its decision rejected it. We conclude that the Board adequately complied with A.R.S. section 41–1061(B), although barely so. Section 41–1061(B)(2) provides that the notice shall include statements of the legal authority and jurisdiction under which the hearing is to be held. Although the notice did not contain this information, Dr. Fuller had previously advised Appellants in writing that the procedures under Board Rule 2–7–806, Arizona Administrative Code, should be followed in requesting reconsideration of the decision.

¶ 43 Section 41–1061(B)(4) provides that the notice shall include a short and plain statement of the matters asserted. In a July 7, 1995 letter from a Board administrator, which appears to constitute the notice, it was noted that the charter contract was rejected by the Board "based on unfavorable information contained in the credit reports of the applicant and one of the board members" and that the Board had voted to reconsider that decision at its August 28 meeting. The letter also states that the School would be afforded the opportunity, as requested, to "correct the Board's misunderstanding about the amended application." We believe this is an adequate statement of the matters to be considered. We find no requirement for a

---

**2.** "License" includes any agency charter. A.R.S. § 41–1001(10) (Supp.1995).

description of the standards to be applied by the Board.

¶ 44 The Appellants further argue that the Board's denial of its right to subpoena witnesses restricted its ability to put on its case and confront the Board staff. Specifically, the Appellants wanted to inquire as to whether a member of the Board's staff had communicated complaints and accusations from people in the community to the Board members. There is no absolute right to a subpoena. The officer presiding at the hearing "may" cause subpoenas to be issued. A.R.S. § 41–1062(A)(4). While the request was a proper one, we are unwilling to say that the Board abused its discretion in refusing to issue it. Since the composition of the Board has changed, the issue may not arise on remand.

## THE BOARD'S ACTIONS DID NOT VIOLATE THE RULE–MAKING PROVISIONS OF THE ADMINISTRATIVE PROCEDURES ACT

¶ 45 Appellants argue that the Board should have complied with the rule-making provisions of the Administrative Procedures Act, A.R.S. §§ 41–1021 to 41–1035, in adopting the rules requiring creditworthiness, refusing to review revised applications, and choosing R2–7–806 as the procedure for reconsideration. We disagree.

¶ 46 First, the Board did not have to adopt a rule to refuse to review amended applications after the application had already been approved. As discussed above, the statute does not require consideration of an amended application in that situation. Of course, for reasons we have already discussed, the Board abused its discretion under the unique facts of this case in not allowing the School to amend its application.

¶ 47 Second, the Board did not have to adopt R2–7–806 as the rule setting forth the procedure for reconsideration of a denied charter. Rule 2–7–806 was already a rule entitled, "Rehearing Procedure." Clearly, it would apply to requests for rehearings before the Board.

¶ 48 Finally, the creditworthiness requirement was not a rule. As defined in A.R.S. section 41–1001(17) (Supp.1995), a "rule" is "an agency statement of general applicability that implements, interprets or prescribes law or policy, or describes the procedure or practice requirements of an agency." Although the creditworthiness requirement might appear to implement the charter schools statute, on close examination it instead is merely an element to be considered by the Board to aid it in exercising its discretion in the awarding of school charters. The requirement was a part of the information-gathering process necessary to enable the Board to make decisions. It was not procedural but instead was a method of obtaining data.

## THE BOARD DID NOT VIOLATE THE OPEN MEETING LAW

¶ 49 Appellants argue that the Board violated the open meeting law because it deliberated privately with respect to legal action against the School. We disagree.

¶ 50 All meetings of public bodies are to be open to the public. A.R.S. § 38–431.01(A). However, upon a public majority vote of the members constituting a quorum, a public body may hold an executive session for any of seven specific purposes. A.R.S. § 38–431.03(A). Two of those purposes are "[d]iscussion or consideration of records exempt by law from public inspection" and "[d]iscussion or consultation for legal advice with the attorney or attorneys of the public body." A.R.S. § 38–431.03(A)(2)–(3).

¶ 51 At the May 22 meeting, the Board voted to go into executive session to review records exempt from public inspection and for consultation for legal advice related to charter school applications. The Appellants argue that the Board did not provide sufficient notice of the matters to be discussed in executive session. However, A.R.S. section 38–431.02(I) requires that notice of an executive session need include "only a general description of the matters to be considered." The motion for the Board to go into executive session used language similar to that used in A.R.S. section 38–431.03(A)(2)–(3) to describe what would be considered in the session. We believe that

description adequately satisfies section 38–431.02(I).

¶ 52 Section 38–431.03(D) provides that "[n]o executive session may be held for the purpose of taking any legal action involving a final vote or decision." The final vote on whether to grant a charter to the School was held in open session. Because the charter was denied on the basis of "an unacceptable financial history as reflected in the credit report" and the credit reports of the School board members were not subject to public inspection, the Board could not have deliberated about them in open session. The legal action was taken in an open meeting; therefore, the Board did not violate the open meeting law.

¶ 53 We have considered the anomaly that appears to exist between allowing the Board to consider financial information in executive session and requiring the Board to make written findings and conclusions that may necessarily disclose such information. We conclude that once the Board makes a decision, and particularly when it declines to grant a charter, the interest in full disclosure warrants the revelation of information pertinent to the decision.

### THE BOARD'S DECISION DID NOT VIOLATE DUE PROCESS

¶ 54 The Appellants argue that they had a protected property interest in the school charter and thus were entitled to due process under the Fifth and Fourteenth Amendments of the United States Constitution and Article 2, Section 4 of the Arizona Constitution. They contend that they acquired a protected property interest as soon as the charter act went into effect. We disagree.

¶ 55 Due process protection vests only when a person has a property interest that is protectible. *S & R Properties v. Maricopa County*, 178 Ariz. 491, 498, 875 P.2d 150, 157 (App.1993). "To be protectible, the property interest must be substantial and present." *Id.* "Property rights do not arise from simple wants and desires; they must be based on legitimate claims of entitlement." *Kerley Indus. v. Pima County*, 785 F.2d 1444, 1446 (9th Cir.1986). The

term "property" in the context · of a due process inquiry does not refer to concessions or privileges that a state controls and may bestow or withhold at will. *Allen v. Graham*, 8 Ariz.App. 336, 339, 446 P.2d 240, 243 (1968). To possess a protected property interest in a benefit under the Fourteenth Amendment, one "must have more than a unilateral expectation of it." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

¶ 56 An expectation of entitlement sufficient to create a property interest "depend[s] largely upon the extent to which the statute contains mandatory language that restricts the discretion of the [agency]." *Jacobson v. Hannifin*, 627 F.2d 177, 180 (9th Cir.1980). Whether an expectation of entitlement is reasonable "is determined largely by the language of the statute and the extent to which the entitlement is couched in mandatory terms." *Wedges/Ledges of California, Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir.1994).

¶ 57 Under the Charter Act, no one has a claim of entitlement to a school charter. The granting of a charter is based on the broad discretion of the sponsor. Only twenty-five charters can be granted by the Board each fiscal year. Clearly then, if more than twenty-five charter applications are submitted to the Board, not all of them can be granted. Indeed, the Charter Act does not require the Board to grant any charters at all. Therefore, the School did not have a property right in a charter and accordingly it was not entitled to due process.

¶ 58 The Appellants next argue that once the School's charter application was approved, it had a property right in the charter. However, even after the Board approved the School's application, the Board still had the discretion to deny a charter contract to the School. In the version of A.R.S. section 15–183(C)(2) in effect when the School applied for a charter, the statute provided that the Board "may approve the charter if the application satisfactorily meets the requirements of this article."

¶ 59 This language, and specifically the use of the word "may," indicates that even if the Board approved the application it still had discretion to approve or not approve the charter, and therefore an entitlement cannot arise. The Board applied a three-step process relating to the application, the charter, and stimulus funds at the time it was considering the School's application. In 1995, the legislature clarified the statute to show that it intended for the approval of the application and approval for the charter to be separate steps in the process.

¶ 60 Because we find that the School failed to demonstrate a protectible property interest in the charter, it was not entitled to due process, and we therefore do not address its arguments that it was denied due process.

### THE BOARD'S ACTIONS DID NOT VIO-LATE APPELLANTS' FREE EXER-CISE, FREE ASSOCIATION, AND PRIVACY RIGHTS

¶ 61 The Appellants argue that the Board's investigation of the religious affiliation of Dr. Moore and the School's other constituents, along with their lifestyles, businesses, and relationships with local authorities, potentially impacts the rights of those constituents to believe and associate as they wish without governmental intervention or inhibition.

¶ 62 We conclude that Appellants' constitutional rights were not burdened by the investigation done by the Board. We cannot presume that the Board's decision was based on any alleged unconstitutional considerations. Section 15–183(E)(2) requires the Board to ensure that charter schools are nonsectarian in their programs, admission policies, employment practices, and all other operations. To meet this responsibility, the Board staff was entitled to look into unsolicited information it received that charged that the School had close ties to a church that might compromise its nonsectarian nature. The investigatory powers of administrative agencies are analogous in their breadth to those of the grand jury. *Polaris Int'l Metals Corp. v. Arizona Corp. Comm'n,* 133 Ariz. 500, 506, 652 P.2d 1023, 1029 (1982) (citing *United States v. Morton*

*Salt Co.,* 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950)).

¶ 63 The record does not show any bias by the Board members against the religious group allegedly associated with the School. Administrative officers are presumed to be fair. *Elia v. Arizona State Bd. of Dental Examiners,* 168 Ariz. 221, 229, 812 P.2d 1039, 1047 (App.1990). Therefore, there is no evidence that even if the Board received information from the investigation it was unfairly influenced by that information.

### THE BOARD'S ACTIONS DID NOT DENY THE SCHOOL EQUAL PROTECTION

¶ 64 The Appellants argue that the Board violated their equal protection rights because it required a credit check of charter school applicants but did not impose that requirement on employees of non-charter public schools. We disagree.

¶ 65 The equal protection clauses of the federal and state constitutions do not prohibit all discrimination or inequality of treatment but only require that all persons in a given class be treated equally and that the classification be reasonable and not arbitrary or capricious. *Pastore v. Arizona Dep't of Economic Sec.,* 128 Ariz. 337, 340–41, 625 P.2d 926, 929–30 (App.1981). It is reasonable for charter schools to be classified differently from non-charter public schools because of the different manner in which they are formed and operated. Furthermore, because the directors and board members of charter schools have more direct access to state funds than do employees of non-charter schools, it is reasonable for the charter school classification to have financial requirements that apply only to that class.

¶ 66 Appellants also argue that the creditworthiness requirement was not applied evenly among charter applicants. Although they cite some examples, we are unable to evaluate this claim. The record does not include the materials considered by the Board concerning other charter applicants.

¶67 We affirm in part and reverse in part the judgment of the superior court upholding the Board's decision to deny the charter. We remand to the superior court with instructions to order that the Board reopen the decision as to whether to grant a charter, allow the supplementation of the application, and make complete findings of fact and conclusions of law to support whatever decision it makes.

VOSS, P.J., and SULT, J., concur.