90 P.3d 1245

Tammie C. BENNETT and James A. Bennett, wife and husband, dba Old Town Square Arts And Crafts Festival, Plaintiffs–Appellants,

v.

Gheral BROWNLOW and Carol Brownlow, husband and wife; Yavapai County, a political subdivision of the State of Arizona, Defendants–Appellees.

No. 1 CA–CV 03–0233.

Court of Appeals of Arizona,
Division 1, Department E.

June 1, 2004.

As Amended June 16, 2004.

Jones & Miller By Kenton D. Jones, Prescott, Attorney for Appellants.

Jones, Skelton & Hochuli, P.L.C., By Randall H. Warner Georgia A. Staton, Phoenix, Attorneys for Appellees.

## OPINION

IRVINE, Judge.

¶ 1 Appellants, Tammie C. Bennett ("Bennett") and her husband, James A. Bennett, appeal from an order granting summary judgment to Yavapai County ("County"). We find that the County violated the First Amendment to the United States Constitution by requiring that sponsors of events on the Courthouse Plaza be non-profit organizations. Therefore, we reverse the judgment and remand for further proceedings.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 The Yavapai County Courthouse, surrounded by grass lawns and large trees, occupies the central block of downtown Prescott. Over the years, the County Board of Supervisors ("Board") has modified how it regulates commercial activities on what it refers to as the "Courthouse Plaza." Regulations adopted in 1992 required anyone

seeking to hold an arts and crafts show or other large event on the Courthouse Plaza to first obtain a permit. The regulations also authorized the Board to set aside dates for reserved events and other dates for maintenance and preservation of the Courthouse Plaza.

¶ 3 Beginning in 1991, Bennett organized an arts and crafts show known as the Old Town Square Arts & Crafts Festival ("Festival"), which by 2000 included more than 170 exhibitors, selling a wide range of items such as stained glass, fine art, folk art, pottery, jewelry, bronze sculptures, and hand-painted clothing. In 1992, Bennett was informed that her event had been designated a county-reserved activity with certain days reserved for the event on the annual calendar. Each year a permit was issued for the Festival, listing the permittee as the "Old Town Square Arts & Crafts Festival" (or some variation of that name), and generally including Bennett's name as well.

¶ 4 The Williamson Valley Volunteer Fire Department ("VFD") was also involved in the Festival. In exchange for a portion of the profits, the VFD authorized Bennett to use its non-profit tax identification number to represent to the City of Prescott tax authorities that the VFD was co-sponsoring the event. This non-profit sponsorship allowed each exhibitor to submit a ten dollar fee in lieu of obtaining their own City Transient Sales Tax Permit and collecting City sales tax. The VFD was not listed on the County permits.

¶ 5 In 2000, the Board designated the Prescott Downtown Partnership as its representative to manage the Courthouse Plaza. Later that year, the Board approved a new ordinance ("Ordinance") requiring all commercial events on the Courthouse Plaza to be sponsored by a non-profit organization recognized as such by the Internal Revenue Service. *See* Ordinance 2000–4, § 104(B). The Ordinance specified that "[t]he Sponsor may designate an Event Coordinator who shall serve as the Sponsors representative with respect to management of the Event." Further, "[i]ssuance of a [Courthouse Plaza] Use Permit shall not be construed to confer any preferential right or expectation upon the recipient with respect to any future use of the Courthouse [Plaza]."

¶ 6 While the Ordinance was under consideration, but before it was approved, Bennett and the VFD parted ways after they could not agree on terms for the sponsorship of the 2001 Festival. Attempting to satisfy the soon-to-be-adopted non-profit sponsor requirement, Bennett submitted an application for the "11th Annual Old Town Square Arts & Crafts Festival," listing the Fraternal Order of Police, Lodge 67 ("FOP"), a non-profit organization, as the sponsor and Bennett as "sponsor agent" and "owner-event coordinator." At the same time, Bennett notified the Prescott Downtown Partnership that the "Old Town Square Arts & Crafts Festival owned and operated by Tammie C. Bennett [intends] to take every legal avenue available to continue to apply for and operate the 10 year old festival which she founded in 1991." She noted that other groups had changed their non-profit sponsors and expressed her intent to apply for a permit with a new sponsor. She also stated her "intent to prove that I am best qualified to promote this event as I have established in my past 10 years of owning and operating the event."

¶ 7 After submitting the original application, Bennett was told that she would have to submit a second application because additional information was needed and inclusion of her name on the application as "owner/event coordinator" was inappropriate. Bennett then submitted an application showing the FOP as sponsor and Tammie C. Bennett as "sponsor agent." The VFD also applied for a permit to hold an arts and crafts show on the same dates.

¶ 8 The Prescott Downtown Partnership awarded a permit to use the Courthouse Plaza on those dates to the VFD. Its letter stated, in part:

The Williamson Valley Volunteer Fire Department has sponsored the Old Town Square Arts and Crafts Fair for more than a decade. The PDP believes that, in order to revoke the Fire Department's sponsorship of the event, a serious and overriding reason must be found. Revoking a sponsorship and awarding a major event to another sponsor is a very serious step that

must be taken carefully and thoughtfully. Such an action must be looked upon as a final and drastic step, not a first step. The fact that a sponsor has made a change in its festival management personnel is not a reason, in and of itself, to revoke an organization's sponsorship. Therefore, it is the recommendation of the PDP that the Williamson Valley Volunteer Fire Department remain the sponsor for the event dates of July 21 and 22, 2001.

Bennett, but not the FOP, appealed to the County Parks Director, who affirmed the decision. She then appealed to the Board, which declined to hold a hearing to review the administrative decision.

¶ 9 Bennett then filed this lawsuit, asserting a variety of state and federal claims against the County. She separately sued County Supervisor Gheral Brownlow for defamation and tortious interference, alleging that he had caused the split between Bennett and the VFD. The cases were consolidated.

¶ 10 The County moved for summary judgment on all claims against it and Bennett filed a cross-motion. The trial court granted the County's motion, denied Bennett's motion, and entered a judgment that allowed immediate appeal pursuant to Rule 54(b), Arizona Rules of Civil Procedure. Bennett filed a timely notice of appeal.

## STANDARD OF REVIEW

■ ¶ 11 Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Orme Sch. v. Reeves,* 166 Ariz. 301, 305, 802 P.2d 1000, 1004 (1990). We review an order granting summary judgment de novo. *Great Am. Mortgage, Inc. v. Statewide Ins. Co.,* 189 Ariz. 123, 125, 938 P.2d 1124, 1126 (App. 1997). We view the facts in the light most favorable to the party against whom sum-

mary judgment was entered. *Id.* at 124, 938 P.2d at 1125. The constitutionality of a statute or ordinance is reviewed de novo, and legislative enactments are presumed constitutional and a party seeking to challenge one bears a heavy burden to show otherwise. *State ex rel. Napolitano v. Gravano,* 204 Ariz. 106, 110, ¶ 11, 60 P.3d 246, 250 (App. 2002).

## DISCUSSION

■ ¶ 12 Bennett argues that the County violated the First Amendment to the United States Constitution, as well as Article 2, section 6 of the Arizona Constitution, by limiting event sponsors to non-profit organizations.[1] She argues that the Courthouse Plaza is a traditional public forum, and the presentation and sale of arts and crafts at the Festival is expressive conduct entitled to constitutional protection.[2]

¶ 13 The County responds that the Ordinance is directed at commercial activity, not speech, and that laws regulating conduct are valid even where they incidentally impede free expression. It also argues that even if First Amendment analysis is applied, the regulations are valid because they are content-neutral, serve a significant governmental interest, are narrowly tailored, and leave open ample alternatives for communication.

■ ¶ 14 This case does not involve restrictions on traditional speech. It involves restrictions on access to a public place. The Supreme Court has recognized that providing access to the locations where ideas will be exchanged is protected by the First Amendment. *Cornelius v. NAACP Legal Def. & Educ. Fund,* 473 U.S. 788, 799, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). Nevertheless, public entities are not required to allow unlimited access to all public property for all purposes, and the Supreme Court has recognized that "[e]ven protected speech is not

---

1. Because the analysis under the Arizona Constitution is the same as the First Amendment, we do not analyze it separately. *State v. Evenson,* 201 Ariz. 209, 218, ¶ 33 n. 15, 33 P.3d 780, 789 (App.2001).

2. It is arguable that Bennett has no standing to challenge the non-profit sponsor requirement of the Ordinance. The only application actually

considered and denied by the County was that of the FOP, which is a non-profit organization. On appeal, the County raises standing as an issue in its response to Bennett's due process argument, but does not question her standing to raise a First Amendment challenge. Because the County does not raise this issue, we do not address it.

equally permissible in all places and at all times." *Id.*

¶ 15 Bennett argues that the sales at the Festival are expressive conduct entitled to protection, citing *Bery v. City of New York,* 97 F.3d 689 (2d Cir.1996). *Bery* rejected the argument that the sale of art is conduct not protected by the First Amendment, and held that "[t]he sale of protected materials is also protected." *Id.* at 695–96; *see also Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 231, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) ("It is no doubt true that a central purpose of the First Amendment 'was to protect the free discussion of governmental affairs.' But our cases have never suggested that expression about philosophical[,] social, artistic, economic, literary or ethical matters . . . is not entitled to full First Amendment protection." (Citations and footnote omitted)); *Universal City Studios, Inc. v. Corley,* 273 F.3d 429, 446 (2d Cir.2001) ("Even dry information, devoid of advocacy, political relevance, or artistic expression, has been accorded First Amendment protection."). We recognize that many vendors in the Courthouse Plaza sell products that do not express a viewpoint or message. Nevertheless, because the central issue of this case is not about regulating traditional speech, but access to public property, we conclude that First Amendment analysis is appropriate. *See Ward v. Rock Against Racism,* 491 U.S. 781, 790–91, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) ("Here the bandshell was open, apparently, to all performers; and we decide the case as one in which the bandshell is a public forum for performances in which the government's right to regulate expression is subject to the protections of the First Amendment.").

¶ 16 The fact that Bennett is before us as a sponsor of an event, not as a vendor, does not change our conclusion. In *Ward,* the petitioner was not one of the rock groups performing at the bandstand, but the sponsor of the musical event at the park bandshell. *Id.* at 784, 109 S.Ct. 2746. The organizer of protected activities is entitled to the protection of the Constitution to a similar degree as those performing the activities. Therefore, Bennett may challenge the Ordinance under the First Amendment.

¶ 17 The validity of the County's policy limiting access to the Courthouse Plaza depends largely on the classification of the public property involved. *See Phoenix Elementary Sch. Dist. No. 1 v. Green,* 189 Ariz. 476, 943 P.2d 836 (App.1997) (public school considered nonpublic forum); *State v. Baldwin,* 184 Ariz. 267, 908 P.2d 483 (App.1995) (public sidewalks remain public forums throughout residential neighborhoods). The Supreme Court has defined three categories of public property. First, the traditional public forum, which includes public streets and parks, dedicated to assembly and debate by tradition or government fiat. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Second, the limited public forum, a place the government has designated as "a place or channel of communication for use by the public at large . . . [or] for use by certain speakers, or for the discussion of certain subjects." *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439. Third, the nonpublic forum, which is a facility or location that is not "by tradition or designation a forum for public communication." *Perry,* 460 U.S. at 46, 103 S.Ct. 948.

¶ 18 A limit on speech in a public forum that is based on the content of the speech will be valid only if the limit is "necessary to serve a compelling state interest" and is "narrowly drawn" to achieve its purpose. *Id.* at 45, 103 S.Ct. 948. A public entity may, however, impose narrow, content-neutral time, place and manner restrictions to serve a significant interest so long as there remain adequate alternative channels of communication. *Id.* A limited public forum may be closed to the public entirely, but so long as it remains open, restrictions are governed by the same standards as the traditional public forum. *Id.* at 46, 103 S.Ct. 948. Nonpublic forums can be the subject of reasonable restrictions on expression, so long as the regulations are not based on hostility to speaker's views. *Id.*

¶ 19 The County suggests that the Courthouse Plaza may not be a public forum when it is devoted to a major event. While it is conceivable that the County could turn the

Courthouse Plaza into a nonpublic forum by closing it off and turning it over to a single promoter,[3] that did not happen here. Public access is not restricted at a major event, but is encouraged. Under these circumstances, we conclude that the Courthouse Plaza is a public forum.

¶ 20 The initial question to be addressed in reviewing a limit on use of a public forum is whether the limit is based on the content of the speech. Bennett argues that the Ordinance is not content-neutral because it discriminates between speakers. The County responds that the Ordinance applies equally to all commercial events, irrespective of any message, and that a distinction based on the non-profit status or the nature of the organization is not content-based. We agree with the County. The Ordinance distinguishes between non-profit and other promoters, but it does not attempt to distinguish between types of organizations or their messages. "Genuine 'content-based' discrimination that runs afoul of the First Amendment is that which turns on disparate, unfavorable treatment, or the threat or danger of such treatment, for expressing particular ideas or viewpoints." *Ariz. Dep't of Revenue v. Great W. Publ'g, Inc.,* 197 Ariz. 72, 77, ¶ 19, 3 P.3d 992, 997 (App.1999). The events at the Courthouse Plaza could involve the exact same vendors and activities, yet the goal of any promoter is to make money from the event. Merely because an organization is non-profit does not mean it has a particular message or any message at all. The Ordinance does not make any distinctions based on the nature of the event or the person or cause being benefitted. Therefore, the Ordinance need not be narrowly tailored to serve a *compelling* state interest, but any time, place and manner restrictions must meet the slightly lesser standard of being narrowly tailored to serve a *significant* government interest and leave open ample alternatives for communication.

¶ 21 The County has the burden to establish a reasonable fit between its asserted reasons for applying the Ordinance and the means chosen to serve those reasons. *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 416, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). The means chosen need not be a perfect fit, or the least restrictive, but must be narrowly tailored to achieve the desired objective. *Id.* at n. 12, 113 S.Ct. 1505.

¶ 22 The County argues that the Ordinance serves its strong interest in preserving the character of the Courthouse Plaza, restricting the number of large events, and ensuring that its property is not used by for-profit businesses to unfairly compete with local merchants. It also believes that the Ordinance is narrowly tailored in that it only applies to commercial events and there is no less restrictive way for it to achieve its objectives. It states that the Ordinance is "based on the notion that, on average, charitable organizations are less likely to pose a threat to local merchants and, on average, provide a greater benefit to the community than for-profits. This is exactly the kind of policy determination legislative bodies like the Board are entitled to make." The County further argues that the Ordinance leaves vendors free to sell their goods at local shops and other arts and crafts shows, or to display them in any manner they wish, so any inhibition on free expression is minimal.

¶ 23 We first note that the constitutionality of the entire Ordinance is not at issue. Bennett does not question the County's authority to limit the number and size of events. She only challenges the requirement that an event sponsor must be a non-profit organization recognized by the Internal Revenue Service. The County's claim that the Ordinance restricts the number of large events and helps maintain the character of the Courthouse Plaza is undoubtedly true, but we do not believe these interests are related in any way to the distinction between for-profit and non-profit organizations. *See Discovery Network,* 507 U.S. at 411, 424, 113 S.Ct. 1505 ("Cincinnati's ... distinction between commercial and noncommercial speech ... bears no relationship *whatsoever* to the particular

3. *See Calash v. City of Bridgeport,* 788 F.2d 80 (2d Cir.1986) (municipal stadium is a nonpublic forum); *but cf. Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (municipal theatre treated as a limited public forum).

interests that the city has asserted. It is therefore an impermissible means of responding to the city's admittedly legitimate interests." (Emphasis in original.)). The County has not shown that limiting event sponsors to non-profit organizations furthers these interests.

¶ 24 In *NMI Perry v. Los Angeles Police Department*, 121 F.3d 1365 (9th Cir.1997), the Ninth Circuit rejected a distinction based on non-profit status. The plaintiffs in that case challenged a Los Angeles ban on soliciting donations or selling goods on "any sidewalk, boardwalk, or public way adjoining a specified length of the Pacific Ocean, including the area known as the Venice Beach Boardwalk." *Id.* at 1367. One exception to the ban was solicitation and sales by non-profit organizations. *Id.* The city claimed a state interest in protecting local merchants from unfair competition and ensuring the free flow of traffic. *Id.* at 1370. While the court recognized the legitimate interests of the city in controlling conduct on public property, it rejected the non-profit distinction:

> The City has a legitimate interest in protecting merchants from unfair competition and in aiding the free flow of traffic. A decrease in the total number of vendors on the Boardwalk would aid that interest. However, there is no justification for eliminating only those individuals with no non-profit affiliation. There is no evidence that those without nonprofit status are any more cumbersome upon fair competition or free traffic flow than those with nonprofit status. There is no justification for allowing those with membership in a nonprofit organization to sell items and solicit donations, while disallowing those with no non-profit membership from the same activities. The regulation ... is not narrowly tailored enough to pass muster.

*Id.* at 1370 (emphasis omitted). We agree with this analysis.

¶ 25 Avoiding competition by for-profit businesses with local merchants may be a valid purpose, but the Ordinance's limitation of event promoters to non-profit organizations is neither significantly related to this purpose nor narrowly tailored to achieve it. The true competition with local merchants does not come from the event promoters, but from the many vendors at the event. The promoter merely coordinates the space. The vendors, on the other hand, sell art, crafts, clothing, and food, and may be in direct competition with local businesses. The County does not assert that the identity of the vendors depends in any way on whether or not the promoter is a non-profit business, so this competition will exist in either case.

¶ 26 The possibility of greater benefits to the community by non-profit organizations is a valid interest, but the County has not established that it is either significant or narrowly tailored. The Ordinance does not ensure that the promoter's proceeds will be used for charitable purposes. The Ordinance expressly allows a sponsor to designate an event coordinator to manage the event. Ordinance 2000–4, § 104(A). A non-profit sponsor could pay the majority of any proceeds to an event coordinator. The Ordinance does not attempt to regulate how much profit a sponsor generates or how the money is used, so we cannot say the limitation to non-profit sponsors furthers the purpose of providing a greater benefit to the community.

¶ 27 In *NMI Perry*, the city claimed that allowing solicitations and sales only by non-profit organizations "provides a simple method of determining whether or not a person is engaged in commercial activity, and of determining the goals or message of the solicitor or seller." *NMI Perry*, 121 F.3d at 1370. The court rejected this, stating that:

> [d]efendants' argument implies that plaintiffs' expressive activities should be accorded less protection than they would if those same activities were conducted by non-profit organizations. This type of speaker-based discrimination is unacceptable.... Once it is decided that the activity here is expressive activity, fully protected by the First Amendment, the fact that plaintiffs are not nonprofit organizations does not affect the level of protection accorded to their speech.

*Id.* at 1371 (emphasis omitted).

¶ 28 If the Courthouse Plaza were a non-public forum, such as an auditorium, stadium,

or similar limited access facility, we would only require that the limitation be reasonable and viewpoint neutral. *See Calash*, 788 F.2d at 84–5. The County would then have considerable discretion to limit access based on the identity of the user, including whether the user is a nonprofit entity. *Id.* The Courthouse Plaza, however, is a public forum, and the Board's ability to limit access is significantly restricted by the Constitution. Therefore, we conclude that the Ordinance violates the First Amendment by prohibiting for-profit individuals or organizations from sponsoring major events on the Courthouse Plaza.[4]

¶ 29 Having found a constitutional violation, the issue becomes what to do about it. Plaintiffs in public forum cases generally seek a court order giving them access to the public place, but Bennett has not sought injunctive relief nor claimed that she is entitled to operate a major event on the Courthouse Plaza in the future. She simply asks us to remand the case to the trial court for a determination of damages. Under the facts of this case, however, we cannot find as a matter of law that Bennett is entitled to damages.

¶ 30 Although we find Bennett's rights under the First Amendment were violated, "no compensatory damages [can] be awarded for a violation of [those] right[s] absent proof of actual injury." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 308–11, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) (emphasis omitted) (holding that "damages based on the abstract 'value' or 'importance' of constitutional rights are not a permissible element of compensatory damages" in such cases.). Bennett presents a plausible argument that she would have been awarded the dates she sought if the requirement that event sponsors be non-profit entities had not been in the Ordinance. We cannot ignore, however, that she had competition for those dates from the VFD, which also submitted an application. Bennett argues that the VFD had little to do with the prior events and,

therefore, had a lesser claim to the dates. Nevertheless, the record plainly shows that Bennett treated the VFD as a sponsor of the prior events for some purposes, so she cannot claim that the VFD was a complete newcomer to the Festival. Moreover, resolving the respective merits of the two applications is not an issue of law that we can decide on appeal.

¶ 31 Bennett argues that she incurred actual injury as a matter of law because she acquired a "grandfathered right" to use the Courthouse Plaza when the County recognized the Festival as a reserved event on its annual calendar. In effect, Bennett argues that she had a vested property right that could not be taken away by the new Ordinance. *See San Carlos Apache Tribe v. Super. Ct.*, 193 Ariz. 195, 205, ¶¶ 15–16, 972 P.2d 179, 189 (1999).

¶ 32 The County responds that Bennett did not have a vested right to use the Courthouse Plaza on the same weekend each year, and "nothing the Board of Supervisors did created a legitimate entitlement interest." Citing *Shelby School v. Arizona State Board of Education*, 192 Ariz. 156, 962 P.2d 230 (App.1998), the County argues that the language of the 1992 Ordinance did not create a property interest in any event sponsor, and although the Board approved the Festival for preferential treatment it did not commit the County to do so in future years. The County further argues that because Bennett admits that the County could eliminate all Courthouse Plaza events, Bennett must be barred from claiming any vested "grandfathered right." We agree.

¶ 33 We see nothing in the 1992 Ordinance that would have created an enforceable right in Bennett to any particular use of the Courthouse Plaza. Although the County wanted to fairly and efficiently administer the Courthouse Plaza by providing some predictability for sponsors, it did not create a property interest in any sponsor. "The term 'property' in the context of a due

4. Because we find the non-profit sponsor requirement of the Ordinance to be unconstitutional under the First Amendment, we need not address Bennett's equal protection and due pro-

cess claims. To the extent the due process argument is a claim to a vested property right, we address it below.

process inquiry does not refer to concessions or privileges that a state controls and may bestow or withhold at will." *Shelby*, 192 Ariz. at 168, ¶ 55, 962 P.2d at 242. Moreover, the County's intent was plainly expressed in the 2000 Ordinance, which notified potential sponsors that "[i]nclusion of a Major Event on the Major Event Schedule shall not be construed to confer any preferential right or expectation upon any individual or group with respect to the sponsorship of that Event." *See* Ordinance 2000–4, § 105.

¶ 34 A vested right does not arise merely because a permit is granted or renewed for a number of years. As this court explained in *Shelby* in the context of charter schools:

Under the Charter Act, no one has a claim of entitlement to a school charter. The granting of a charter is based on the broad discretion of the sponsor. Only twenty-five charters can be granted by the Board each fiscal year. Clearly then, if more than twenty-five charter applications are submitted to the Board, not all of them can be granted. Indeed, the Charter Act does not require the Board to grant any charters at all. Therefore, the School did not have a property right in a charter and accordingly it was not entitled to due process.

The Appellants next argue that once the School's charter application was approved, it had a property right in the charter. However, even after the Board approved the School's application, the Board still had the discretion to deny a charter contract to the School. In the version of A.R.S. section 15–183(C)(2) in effect when the School applied for a charter, the statute provided that the Board "may approve the charter if the application satisfactorily meets the requirements of this article."

This language, and specifically the use of the word "may," indicates that even if the Board approved the application it still had discretion to approve or not approve the charter, and therefore an entitlement cannot arise.

*Shelby*, 192 Ariz. at 168 ¶¶ 57–59, 962 P.2d at 242. Similarly, the 1992 and 2000 Ordinances authorized the issuance of permits, but did not require them. Therefore, we conclude that Bennett does not have a vested right to the use of the Courthouse Plaza.

¶ 35 This does not mean that Bennett cannot prove that she was harmed by the inclusion of the unconstitutional provision in the Ordinance. The County does not possess unfettered discretion in allocating the use of public spaces. It must apply some standards in choosing between competing applications. *See Thomas v. Chi. Park Dist.*, 534 U.S. 316, 323, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002) ("time, place, and manner regulation[s] [must] contain adequate standards to guide the official's decision and render it subject to effective judicial review."). In this case, after enacting the Ordinance, the County adopted Supplemental Rules and Regulations that specify the criteria for selecting sponsors of major events. Aside from the nonprofit requirement that we find to be invalid, the Rules require an applicant to:

Provide documentation of the financial resources and fiscal controls required to properly administer The Event; and

Be able to demonstrate a benefit to Prescott/Yavapai County from its conduct of the event; and

Have demonstrated prior successful experience in sponsorship of Courthouse [Plaza] Events to include organization and operation of Events as well as adherence to the Ordinance and Supplemental Rules and Regulations; or

Have demonstrated successful experience in the sponsorship of events of like kind in other locations to include organization and operation of events as well as adherence to applicable ordinances, rules and regulations.

Supplemental Rules § 2(A)(iii)-(vi).

¶ 36 Applying these standards to this record, we cannot say that Bennett's application would have been granted in the absence of the requirement that a sponsor be a nonprofit organization. Bennett and the VFD each claim prior experience in sponsoring Courthouse Plaza events. Each would have to demonstrate a benefit to the community and provide documentation of financial resources. Determining whether the County

would have balanced these factors in Bennett's favor in the absence of the unconstitutional requirement that the event sponsor be a non-profit organization is an issue for the trier of fact. Therefore, although we find the Ordinance to be unconstitutional in part, whether Bennett was damaged from that unconstitutionality, and the amount of any damages, are issues to be determined at trial.

### CONCLUSION

¶ 37 We reverse the judgment and remand for further proceedings. Neither party requests attorneys' fees. We award Bennett her costs upon her compliance with Rule 21, Arizona Rules of Civil Appellate Procedure.

CONCURRING: LAWRENCE F. WINTHROP, Judge and MAURICE PORTLEY, Judge.